# UNITED STATES *v.* HENRY

No. 79–121.  Argued January 16, 1980—Decided June 16, 1980

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, POWELL, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 275. BLACKMUN, J., filed a dissenting

opinion, in which WHITE, J., joined, *post*, p. 277. REHNQUIST, J., filed a dissenting opinion, *post*, p. 289.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann,* and *Edwin S. Kneedler.*

*Michael E. Geltner* argued the cause for respondent. With him on the brief were *Larry J. Ritchie* and *William W. Greenhalgh.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether respondent's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements made by respondent to his cellmate, an undisclosed Government informant, after indictment and while in custody. 444 U. S. 824 (1979).

I

The Janaf Branch of the United Virginia Bank/Seaboard National in Norfolk, Va., was robbed in August 1972. Witnesses saw two men wearing masks and carrying guns enter the bank while a third man waited in the car. No witnesses were able to identify respondent Henry as one of the participants. About an hour after the robbery, the getaway car was discovered. Inside was found a rent receipt signed by one "Allen R. Norris" and a lease, also signed by Norris, for a house in Norfolk. Two men, who were subsequently convicted of participating in the robbery, were arrested at the rented house. Discovered with them were the proceeds of the robbery and the guns and masks used by the gunmen.

Government agents traced the rent receipt to Henry; on the basis of this information, Henry was arrested in Atlanta, Ga., in November 1972. Two weeks later he was indicted for

armed robbery under 18 U. S. C. §§ 2113 (a) and (d). He was held pending trial in the Norfolk city jail. Counsel was appointed on November 27.

On November 21, 1972, shortly after Henry was incarcerated, Government agents working on the Janaf robbery contacted one Nichols, an inmate at the Norfolk city jail, who for some time prior to this meeting had been engaged to provide confidential information to the Federal Bureau of Investigation as a paid informant. Nichols was then serving a sentence on local forgery charges. The record does not disclose whether the agent contacted Nichols specifically to acquire information about Henry or the Janaf robbery.[1]

Nichols informed the agent that he was housed in the same cellblock with several federal prisoners awaiting trial, including Henry. The agent told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery. In early December, after Nichols had been released from jail, the agent again contacted Nichols, who reported that he and Henry had engaged in conversation and that Henry had told him about the robbery of the Janaf bank.[2] Nichols was paid for furnishing the information.

When Henry was tried in March 1973, an agent of the

---

[1] The record does disclose that on November 21, 1972, the same day the agent contacted Nichols, the agent's supervisor interrogated Henry at the jail. After denying participation in the robbery, Henry exercised his right to terminate the interview.

[2] Henry also asked Nichols if he would help him once Nichols was released. Henry requested Nichols to go to Virginia Beach and contact a woman there. He prepared instructions on how to find the woman and wanted Nichols to tell her to visit Henry in the Norfolk jail. He explained that he wanted to ask the woman to carry a message to his partner, who was incarcerated in the Portsmouth city jail. Henry also gave Nichols a telephone number and asked him to contact an individual named "Junior" or "Nail." In addition Henry asked Nichols to provide him with a floor plan of the United States Marshals' office and a handcuff key because Henry intended to attempt an escape.

Federal Bureau of Investigation testified concerning the events surrounding the discovery of the rental slip and the evidence uncovered at the rented house. Other witnesses also connected Henry to the rented house, including the rental agent who positively identified Henry as the "Allen R. Norris" who had rented the house and had taken the rental receipt described earlier. A neighbor testified that prior to the robbery she saw Henry at the rented house with John Luck, one of the two men who had by the time of Henry's trial been convicted for the robbery. In addition, palm prints found on the lease agreement matched those of Henry.

Nichols testified at trial that he had "an opportunity to have some conversations with Mr. Henry while he was in the jail," and that Henry told him that on several occasions he had gone to the Janaf Branch to see which employees opened the vault. Nichols also testified that Henry described to him the details of the robbery and stated that the only evidence connecting him to the robbery was the rental receipt. The jury was not informed that Nichols was a paid Government informant.

On the basis of this testimony,[3] Henry was convicted of bank robbery and sentenced to a term of imprisonment of 25 years. On appeal, he raised no Sixth Amendment claims. His conviction was affirmed, judgt. order reported at 483 F. 2d 1401 (CA4 1973), and his petition to this Court for a writ of certiorari was denied. 421 U. S. 915 (1975).

On August 28, 1975, Henry moved to vacate his sentence pursuant to 28 U. S. C. § 2255.[4] At this stage, he stated that

---

[3] Joseph Sadler, another of Henry's cellmates, also testified at trial. He stated that Henry had told him that Henry had robbed a bank with a man named "Lucky" or "Luck." Sadler testified that on advice of counsel he informed Government agents of the conversation with Henry. Sadler was not a paid informant and had no arrangement to monitor or report on conversations with Henry.

[4] In his § 2255 petition, Henry also alleged that Sadler's testimony was perjurious; that the Government failed to disclose *Brady* material, see

he had just learned that Nichols was a paid Government informant and alleged that he had been intentionally placed in the same cell with Nichols so that Nichols could secure information about the robbery. Thus, Henry contended that the introduction of Nichols' testimony violated his Sixth Amendment right to the assistance of counsel. The District Court denied the motion without a hearing. The Court of Appeals, however, reversed and remanded for an evidentiary inquiry into "whether the witness [Nichols] was acting as a government agent during his interviews with Henry."

On remand, the District Court requested affidavits from the Government agents. An affidavit was submitted describing the agent's relationship with Nichols and relating the following conversation:

> "I recall telling Nichols at this time to be alert to any statements made by these individuals [the federal prisoners] regarding the charges against them. I specifically recall telling Nichols that he was not to question Henry or these individuals about the charges against them, however, if they engaged him in conversation or talked in front of him, he was requested to pay attention to their statements. I recall telling Nichols not to initiate any conversations with Henry regarding the bank robbery charges against Henry, but that if Henry initiated the conversations with Nichols, I requested Nichols to pay attention to the information furnished by Henry."

The agent's affidavit also stated that he never requested anyone affiliated with the Norfolk city jail to place Nichols in the same cell with Henry.

The District Court again denied Henry's § 2255 motion, concluding that Nichols' testimony at trial did not violate Henry's

---

*Brady* v. *Maryland,* 373 U. S. 83 (1963); that the United States Attorney's argument to the jury was impermissibly prejudicial; and that his trial counsel was incompetent. The District Court rejected each of these grounds, and none of these issues is before this Court.

Sixth Amendment right to counsel. The Court of Appeals reversed and remanded, holding that the actions of the Government impaired the Sixth Amendment rights of the defendant under *Massiah* v. *United States,* 377 U. S. 201 (1964). The court noted that Nichols had engaged in conversation with Henry and concluded that if by association, by general conversation, or both, Nichols had developed a relationship of trust and confidence with Henry such that Henry revealed incriminating information, this constituted interference with the right to the assistance of counsel under the Sixth Amendment.[5]   590 F. 2d 544 (1978).

## II

This Court has scrutinized postindictment confrontations between Government agents and the accused to determine whether they are "critical stages" of the prosecution at which the Sixth Amendment right to the assistance of counsel attaches. See, *e. g., United States* v. *Ash,* 413 U. S. 300 (1973); *United States* v. *Wade,* 388 U. S. 218 (1967). The present case involves incriminating statements made by the accused to an undisclosed and undercover Government informant while in custody and after indictment. The Government characterizes Henry's incriminating statements as voluntary and not the result of any affirmative conduct on the part of Government agents to elicit evidence. From this, the Government argues that Henry's rights were not violated, even assuming the Sixth Amendment applies to such surreptitious confrontations; in short, it is contended that the Government has not interfered with Henry's right to counsel.[6]

---

[5] The Court of Appeals acknowledged that the testimony of Sadler, another cellmate of Henry, supported the conviction but was not willing to conclude beyond a reasonable doubt that Nichols' testimony did not influence the jury. *Chapman* v. *California,* 386 U. S. 18, 24 (1967).

[6] Although both the Government, and MR. JUSTICE REHNQUIST in dissent, question the continuing vitality of the *Massiah* branch of the Sixth Amendment, we reject their invitation to reconsider it.

This Court first applied the Sixth Amendment to postindictment communications between the accused and agents of the Government in *Massiah* v. *United States, supra.* There, after the accused had been charged, he made incriminating statements to his codefendant, who was acting as an agent of the Government. In reversing the conviction, the Court held that the accused was denied "the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicted from him." *Id.,* at 206. The *Massiah* holding rests squarely on interference with his right to counsel.

The question here is whether under the facts of this case a Government agent "deliberately elicited" incriminating statements from Henry within the meaning of *Massiah.* Three factors are important. First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.

The Court of Appeals viewed the record as showing that Nichols deliberately used his position to secure incriminating information from Henry when counsel was not present and held that conduct attributable to the Government. Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion. The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information.[7]

---

[7] The affidavit of the agent discloses that "Nichols had been paid by the FBI for expenses and services in connection with information he had provided" as an informant for at least a year. The only reasonable inference from this statement is that Nichols was paid when he produced information, not that Nichols was continuously on the payroll of the FBI. Here, the service requested of Nichols was that he obtain incriminating

This combination of circumstances is sufficient to support the Court of Appeals' determination. Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result.

The Government argues that the federal agents instructed Nichols not to question Henry about the robbery.[8] Yet according to his own testimony, Nichols was not a passive listener; rather, he had "some conversations with Mr. Henry" while he was in jail and Henry's incriminatory statements were "the product of this conversation." While affirmative interrogation, absent waiver, would certainly satisfy *Massiah*, we are not persuaded, as the Government contends, that *Brewer* v. *Williams*, 430 U. S. 387 (1977), modified *Massiah*'s "deliberately elicited" test. See *Rhode Island* v. *Innis*, 446 U. S. 291, 300, n. 4 (1980).[9] In *Massiah*, no inquiry was

information from Henry; there is no indication that Nichols would have been paid if he had not performed the requested service.

[8] Two aspects of the agent's affidavit are particularly significant. First, it is clear that the agent in his discussions with Nichols singled out Henry as the inmate in whom the agent had a special interest. Thus, the affidavit relates that "I specifically recall telling Nichols that he was not to question *Henry* or these individuals" and "I recall telling Nichols not to initiate any conversations *with Henry* regarding the bank robbery charges," but to "pay attention to the information furnished *by Henry*." (Emphasis added.) Second, the agent only instructed Nichols not to question Henry or to initiate conversations regarding the bank robbery charges. Under these instructions, Nichols remained free to discharge his task of eliciting the statements in myriad less direct ways.

[9] The situation where the "listening post" is an inanimate electronic device differs; such a device has no capability of leading the conversation into any particular subject or prompting any particular replies. See, *e. g., United States* v. *Hearst*, 563 F. 2d 1331, 1347–1348 (CA9 1977), cert. denied, 435 U. S. 1000 (1978). However, that situation is not presented in this case, and there is no occasion to treat it; nor are we called upon to pass on the situation where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged.

made as to whether Massiah or his codefendant first raised the subject of the crime under investigation.[10]

It is quite a different matter when the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed. In *Hoffa* v. *United States,* 385 U. S. 293, 302 (1966), for example, this Court held that "no interest legitimately protected by the Fourth Amendment is involved" because "the Fourth Amendment [does not protect] a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." See also *United States* v. *White,* 401 U. S. 745 (1971). Similarly, the Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion. See *Hoffa* v. *United States, supra,* at 303–304. But the Fourth and Fifth Amendment claims made in those cases are not relevant to the inquiry under the Sixth Amendment here—whether the Government has interfered with the right to counsel of the accused by "deliberately eliciting" incriminating statements. Our holding today does not modify *White* or *Hoffa.*

It is undisputed that Henry was unaware of Nichols' role as a Government informant. The Government argues that this Court should apply a less rigorous standard under the

[10] No doubt the role of the agent at the time of the conversations between Massiah and his codefendant was more active than that of the federal agents here. Yet the additional fact in *Massiah* that the agent was monitoring the conversations is hardly determinative. In both *Massiah* and this case, the informant was charged with the task of obtaining information from an accused. Whether Massiah's codefendant questioned Massiah about the crime or merely engaged in general conversation about it was a matter of no concern to the *Massiah* Court. Moreover, we deem it irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his codefendant while here the agents were fortunate enough to have an undercover informant already in close proximity to the accused.

Sixth Amendment where the accused is prompted by an undisclosed undercover informant than where the accused is speaking in the hearing of persons he knows to be Government officers. That line of argument, however, seeks to infuse Fifth Amendment concerns against compelled self-incrimination into the Sixth Amendment protection of the right to the assistance of counsel. An accused speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then "arm's-length" adversaries.

When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents. Indeed, the *Massiah* Court noted that if the Sixth Amendment "is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse." The Court pointedly observed that Massiah was more seriously imposed upon because he did not know that his codefendant was a Government agent. 377 U. S., at 206.

Moreover, the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. See *Johnson* v. *Zerbst,* 304 U. S. 458 (1938). In that setting, Henry, being unaware that Nichols was a Government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel.

Finally, Henry's incarceration at the time he was engaged in conversation by Nichols is also a relevant factor.[11] As a ground

---

[11] This is not to read a "custody" requirement, which is a prerequisite to the attachment of *Miranda* rights, into this branch of the Sixth Amend-

for imposing the prophylactic requirements in *Miranda* v. *Arizona*, 384 U. S. 436, 467 (1966), this Court noted the powerful psychological inducements to reach for aid when a person is in confinement. See also *id.*, at 448–454. While the concern in *Miranda* was limited to custodial police interrogation, the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents. The Court of Appeals determined that on this record the incriminating conversations between Henry and Nichols were facilitated by Nichols' conduct and apparent status as a person sharing a common plight. That Nichols had managed to gain the confidence of Henry, as the Court of Appeals determined, is confirmed by Henry's request that Nichols assist him in his escape plans when Nichols was released from confinement.[12]

Under the strictures of the Court's holdings on the exclusion of evidence, we conclude that the Court of Appeals did not err in holding that Henry's statements to Nichols should not have been admitted at trial. By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel.[13] This is

---

ment. Massiah was in no sense in custody at the time of his conversation with his codefendant. Rather, we believe the fact of custody bears on whether the Government "deliberately elicited" the incriminating statements from Henry.

[12] This is admittedly not a case such as *Massiah* where the informant and the accused had a prior longstanding relationship. Nevertheless, there is ample evidence in the record which discloses that Nichols had managed to become more than a casual jailhouse acquaintance. That Henry could be induced to discuss his past crime is hardly surprising in view of the fact that Nichols had so ingratiated himself that Henry actively solicited his aid in executing his next crime—his planned attempt to escape from the jail.

[13] The holding of the Court of Appeals that this was not harmless error is on less firm grounds in view of the strong evidence against Henry, in-

not a case where, in Justice Cardozo's words, "the constable . . . blundered," *People* v. *DeFore,* 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926); rather, it is one where the "constable" planned an impermissible interference with the right to the assistance of counsel.[14]

The judgment of the Court of Appeals for the Fourth Circuit is

*Affirmed.*

MR. JUSTICE POWELL, concurring.

The question in this case is whether the Government deliberately elicited information from respondent in violation of the rule of *Massiah* v. *United States,* 377 U. S. 201 (1964), and *Brewer* v. *Williams,* 430 U. S. 387 (1977). I join the opinion of the Court, but write separately to state my understanding of the Court's holding.

I

In *Massiah* v. *United States,* this Court held that the Government violated the Sixth Amendment when it deliberately elicited incriminating information from an indicted defendant who was entitled to assistance of counsel. 377 U. S., at

---

cluding the testimony of a neutral fellow inmate, Henry's rental of the hideaway house, and his presence there with the other participants in the robbery before the crime. The Government, however, has not argued that the error was harmless, and on balance, we are not inclined to disturb the determination of the Court of Appeals.

[14] Although it does not bear on the constitutional question in this case, we note that Disciplinary Rule 7–104 (A) (1) of the Code of Professional Responsibility provides:

"(A) During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

See also Ethical Consideration 7–18.

206. Government agents outfitted an informant's automobile with radio transmitting equipment and instructed the informant to engage the defendant in conversation relating to the crimes. *United States* v. *Massiah,* 307 F. 2d 62, 72 (CA2 1962) (Hays, J., dissenting). In suppressing statements overheard during the resulting conversation, the Court emphasized that the Sixth Amendment must " 'apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. . . .' " 377 U. S., at 206, quoting 307 F. 2d, at 72 (Hays, J., dissenting). Similarly, in *Brewer* v. *Williams, supra,* we applied *Massiah* to a situation in which a police detective purposefully isolated a suspect from his lawyers and, during a long ride in a police car, elicited incriminating remarks from the defendant through skillful interrogation. We suppressed the statement because the government "deliberately and designedly set out to elicit" information from a suspect. 430 U. S., at 399; see *id.,* at 407 (MARSHALL, J., concurring); *id.,* at 412 (POWELL, J., concurring).

The rule of *Massiah* serves the salutary purpose of preventing police interference with the relationship between a suspect and his counsel once formal proceedings have been initiated. But *Massiah* does not prohibit the introduction of spontaneous statements that are not elicited by governmental action. Thus, the Sixth Amendment is not violated when a passive listening device collects, but does not induce, incriminating comments. See *United States* v. *Hearst,* 563 F. 2d 1331, 1347–1348 (CA9 1977), cert. denied, 435 U. S. 1000 (1978). Similarly, the mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional. In such a case, the question would be whether the informant's actions constituted deliberate and "surreptitious interrogatio[n]" of the defendant. If they did not, then there would be no interference with the relationship between client and counsel.

## II

I view this as a close and difficult case on its facts because no evidentiary hearing has been held on the *Massiah* claim. Normally, such a hearing is helpful to a reviewing court and should be conducted. On balance, however, I accept the view of the Court of Appeals and of the Court that the record adequately demonstrates the existence of a *Massiah* violation. I could not join the Court's opinion if it held that the mere presence or incidental conversation of an informant in a jail cell would violate *Massiah.** To demonstrate an infringement of the Sixth Amendment, a defendant must show that the government engaged in conduct that, considering all of the circumstances, is the functional equivalent of interrogation. See *Brewer* v. *Williams,* 430 U. S., at 399; *id.,* at 411, 412 (POWELL, J., concurring). See also *Rhode Island* v. *Innis,* 446 U. S. 291 (1980).

Because I understand that the decision today rests on a conclusion that this informant deliberately elicited incriminating information by such conduct, I join the opinion of the Court.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE WHITE joins, dissenting.

In this case the Court, I fear, cuts loose from the moorings of *Massiah* v. *United States,* 377 U. S. 201 (1964),[1] and overlooks or misapplies significant facts to reach a result that is not required by the Sixth Amendment, by established precedent, or by sound policy.

The Court of Appeals resolved this case by a divided vote, with all three judges writing separately. Three of the seven

---

*By reserving the question whether the mere presence of an informant in a jail cell violates *Massiah,* the Court demonstrates that its holding is not premised upon such a theory. *Ante,* at 269, n. 6.

[1] For purposes of this case, I see no need to abandon *Massiah* v. *United States,* as MR. JUSTICE REHNQUIST does.

judges then on that court dissented from the denial of rehearing en banc. And MR. JUSTICE POWELL, in his separate concurring opinion, obviously is less than comfortable, finds the case "close and difficult," *ante,* at 277, and writes to assure that his concurring vote preserves his contrary posture when the Court will be confronted with only "the mere presence or incidental conversation of an informant in a jail cell." *Ibid.* This division of opinion about this case attests to the importance of correct factual analysis here.

Because I view the principles of *Massiah* and the facts of this case differently than the Court does, I dissent.

## I

*Massiah* mandates exclusion only if a federal agent "deliberately elicited" statements from the accused in the absence of counsel. 377 U. S., at 206. The word "deliberately" denotes intent. *Massiah* ties this intent to the act of elicitation, that is, to conduct that draws forth a response. Thus *Massiah,* by its own terms, covers only action undertaken with the specific intent to evoke an inculpatory disclosure.

Faced with Agent Coughlin's unequivocal expression of an intent *not* to elicit statements from respondent Henry, but merely passively to receive them, *ante,* at 268; App. to Pet. for Cert. 58a, the Court, in its decision to affirm the judgment of the Court of Appeals, has no choice but to depart from the natural meaning of the *Massiah* formulation. The Court deems it critical that informant Nichols had been a paid informant; that Agent Coughlin was aware that Nichols "had access" to Henry and "would be able to engage him in conversations without arousing Henry's suspicion"; and that payment to Nichols was on a contingent-fee basis. *Ante,* at 270. Thus, it is said, even if Coughlin's "statement is accepted . . . he must have known that such propinquity likely would lead to that result" (that is, that Nichols would take "affirmative steps to secure incriminating information"). *Ante,* at 271. Later, the Court goes even further, characterizing this as a

case of "intentionally creating a situation *likely to induce* Henry to make incriminating statements." *Ante,* at 274. (Emphasis added.) This determination, coupled with the statement that Nichols "prompted" respondent Henry's remarks, *ante,* at 273, and see *ante,* at 271, n. 9, leads the Court to find a *Massiah* violation.

Thus, while claiming to retain the "deliberately elicited" test, the Court really forges a new test that saps the word "deliberately" of all significance. The Court's extension of *Massiah* would cover even a "negligent" triggering of events resulting in reception of disclosures. This approach, in my view, is unsupported and unwise.

A. *Authority.* The Court's precedents appear to me to be contrary to this new objective approach. *Spano* v. *New York,* 360 U. S. 315 (1959), whose concurring opinions presaged *Massiah,* see 377 U. S., at 204, concerned an "all-night inquisition" during which the defendant "repeatedly asked to be allowed to send for his lawyer." 360 U. S., at 327 (concurring opinion). Obviously, that case involved deliberate efforts to extract information in the absence of counsel. In *Massiah* itself, the agent engineered a pretrial meeting between the accused and a turncoat codefendant. The agent instructed the latter to talk to the defendant about the crime, see *United States* v. *Massiah,* 307 F. 2d 62, 66 (CA2 1962); *id.,* at 72 (dissenting opinion), and he bugged the meeting place so he could listen in.[2] *United States* v. *Ash,* 413 U. S. 300 (1973), by emphasizing that *Massiah* involved a "ruse" and that *Massiah*'s purpose was to neutralize "the overreaching of the prosecution," *id.,* at 312, reinforced the view that deliberate elicitation entails purposeful police action.

If any question could possibly have remained about the subjective nature of the *Massiah* inquiry, it was dispelled by

---

[2] The planted bug, of course, not only underscored the agent's deliberate design to obtain incriminating information. By permitting the agent to monitor whether the codefendant informant abided by his agreement, it all but ensured that affirmative elicitation in fact would occur.

*Brewer* v. *Williams,* 430 U. S. 387 (1977). There the Court closely examined testimony regarding the agent's intentions. In the face of vigorous dissents, it found a Sixth Amendment violation only because "[t]here can be no serious doubt . . . that Detective Leaming *deliberately and designedly* set out to elicit information from Williams," and because in giving his "Christian burial speech," Leaming "purposely sought . . . to obtain as much incriminating information as possible." *Id.,* at 399 (emphasis added). See also *Rhode Island* v. *Innis,* 446 U. S. 291, 300, n. 4 (1980) (reaffirming the "deliberately elicited" criterion); Kamisar, *Brewer v. Williams, Massiah,* and *Miranda:* What is "Interrogation"? When Does it Matter?, 67 Geo. L. J. 1, 42 (1978) ("The use of the term 'deliberately elicited' seems to be quite intentional").[3]

The unifying theme of *Massiah* cases, then, is the presence of deliberate, designed, and purposeful tactics, that is, the agent's use of an investigatory tool with the specific intent of extracting information in the absence of counsel. Thus, the Court's "likely to induce" test fundamentally restructures *Massiah.* Even if the agent engages in no "overreaching," and believes his actions to be wholly innocent and passive, evidence he comes by must be excluded if a court, with the convenient benefit of 20/20 hindsight, finds it likely that the agent's actions would induce the statements.

B. *Policy.* For several reasons, I believe that the Court's revamping of *Massiah* abrogates sound judicial policy. First, its test will significantly broaden Sixth Amendment exclusion; yet, as THE CHIEF JUSTICE has stressed before, the "high price society pays for such a drastic remedy" as exclusion of indisputably reliable evidence in criminal trials cannot be denied. See, *e. g., Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 413 (1971) (dissenting opinion). Second, I think the Court's approach fails to appre-

---

[3] It is noteworthy that the phrase "deliberately elicited" appears at least three times in the *Massiah* opinion. See 377 U. S., at 204, 206.

ciate fully and to accommodate adequately the "value" and the "unfortunate necessity of undercover work." *Weatherford* v. *Bursey*, 429 U. S. 545, 557 (1977). Third, I find it significant that the proffered statements are unquestionably voluntary. See *United States* v. *Washington*, 431 U. S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable"). Fourth, the Court condemns and punishes police conduct that I do not find culpable. See *Wilson* v. *Henderson*, 584 F. 2d 1185, 1191 (CA2 1978), cert. denied, 442 U. S. 945 (1979) (investigating officer's "directions, 'Don't ask questions, just keep your ears open,' suggest familiarity and attempted compliance with, not circumvention of, the principle of *Massiah*"). Fifth, at least absent an active, orchestrated ruse, I have great difficulty perceiving how canons of fairness are violated when the Government uses statements flowing from a "wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa* v. *United States*, 385 U. S. 293, 302 (1966).[4]

Finally, I note the limits, placed in other Sixth Amendment cases, of providing counsel to counterbalance prosecutorial expertise and to aid defendants faced with complex and unfamiliar proceedings. See MR. JUSTICE REHNQUIST's dissenting opinion, *post*, at 290–298.[5] While not out of line with the

---

[4] The Court's "likely to induce" analysis might also be subjected to the following criticism:

"Few, if any, police officers are competent to make the kind of evaluation seemingly contemplated; even a psychiatrist asked to express an expert opinion on these aspects of a suspect in custody would very likely employ extensive questioning and observation to make the judgment now charged to police officers." *Rhode Island* v. *Innis*, 446 U. S. 291, 304 (1980) (opinion concurring in judgment).

[5] MR. JUSTICE POWELL observes, *ante*, at 276, that *"Massiah* serves the salutary purpose of preventing police interference with the relationship between a suspect and his counsel once formal proceedings have been

Court's prior right-to-counsel cases, *Massiah* certainly is the decision in which Sixth Amendment protections have been extended to their outermost point. I simply do not perceive any good reason to give *Massiah* the expansion it receives in this case.[6]

## II

In my view, the Court not only missteps in forging a new *Massiah* test; it proceeds to misapply the very test it has created. The new test requires a showing that the agent cre-

---

initiated." I fail to see any greater "interference" on the facts of this case than in a case where an inmate is permitted to have a conversation with a trusted visitor, but with an electronic listening device in place, a practice MR. JUSTICE POWELL finds unobjectionable. *Ibid.* Indeed, bugging might be said to present an even stronger case for finding "deliberate elicitation." There is, after all, a likelihood that the inmate will place added confidence in a relative or longtime friend who visits him. Nichols, in contrast, had not known Henry previously. Moreover, with bugging, a defendant cannot know what he is dealing with. He lacks the ability intelligently to gauge the probability that his confidences will be "reported" back to government agents. See *Wilson* v. *Henderson,* 584 F. 2d 1185, 1191 (CA2 1978), cert. denied, 442 U. S. 945 (1979).

[6] Rejection of an objective test in this context is not inconsistent with *Rhode Island* v. *Innis, supra,* since "the policies underlying the two constitutional protections [Fifth and Sixth Amendments] are quite distinct." 446 U. S., at 300, n. 4. *Miranda*'s "prophylactic rule," see *Michigan* v. *Payne,* 412 U. S. 47, 53 (1973), seeks to protect a suspect's privilege against self-incrimination from "the compulsion inherent in custodial surroundings" when "interrogation" occurs. *Miranda* v. *Arizona,* 384 U. S. 436, 458 (1966). Thus, in *Miranda* cases, the degree of compulsion is critical. Beyond an objectively defined "pressure point," statements will be deemed presumedly compelled and therefore properly excluded, absent the countercoercive effect of *Miranda* warnings. See *id.,* at 467. *Massiah,* in contrast to *Miranda,* is not rooted in the Fifth Amendment privilege against self-incrimination. Rather, it is expressly designed to counter "deliberat[e]" interference with an indicted suspect's right to counsel. By focusing on deliberateness, *Massiah* imposes the exclusionary sanction on that conduct that is most culpable, most likely to frustrate the purpose of having counsel, and most susceptible to being checked by a deterrent. Cf. *Brown* v. *Illinois,* 422 U. S. 590, 604 (1975).

ated a situation "likely to induce" the production of incriminatory remarks, and that the informant in fact "prompted" the defendant. Even accepting the most capacious reading of both this language and the facts, I believe that neither prong of the Court's test is satisfied.

A. *"Likely to Induce."* In holding that Coughlin's actions were likely to induce Henry's statements, the Court relies on three facts: a contingent-fee arrangement; Henry's assumption that Nichols was just a cellmate; and Henry's incarceration.[7]

The Court states: "The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information." *Ante,* at 270. The District Court, however, made no such finding, and I am unconvinced that the evidence of record establishes such an understanding.[8] In any event, I question whether the existence of a contingent-fee arrangement is at all significant. The reasonable conclusion of an informant like Nichols would be that, whatever the arrangement, he would *not* be remu-

---

[7] The Court also notes that Henry, being located in the same cellblock as Nichols, was accessible to the informant. It nonetheless totally ignores the fact that the investigating agent had nothing to do with placing Henry and Nichols in the same cellblock. Indeed, the record shows that Coughlin did not confer with Nichols initially with the purpose of obtaining evidence about Henry; rather, the agent's affidavit indicates that he was unaware that Nichols and Henry were in the same cellblock until Nichols informed him. App. to Pet. for Cert. 57a–58a.

[8] The record shows that Nichols "had been paid by the FBI for expenses and services in connection with information he had provided on . . . previous occasions," *id.,* at 57a, and that "Nichols was paid by the FBI for expenses and services in connection with the [investigation] of Henry." *Id.,* at 59a. These facts establish at most an amorphous course of dealing, emanating from an unspecified number of previous investigations. They do not show that Nichols previously was paid only when he produced information. There can be no assurance that Nichols would *not* have been paid had he failed to come up with evidence implicating Henry or other federal defendants. Nor is there anything to indicate that Nichols acted on this assumption.

nerated if he breached his promise; yet the Court asks us to infer that Coughlin's conversation with Nichols "likely would lead" Nichols to engage in the very conduct which Coughlin told him to avoid. *Ante,* at 271.

The Court also emphasizes that Henry was "unaware that Nichols was a Government agent." *Ante,* at 273. One might properly assign this factor some importance, were it not for *Brewer* v. *Williams.* In that case, the Court explicitly held that the fact "[t]hat the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is *constitutionally irrelevant."* 430 U. S , at 400. (Emphasis added.) The Court's teeter-tottering with this factor in *Massiah* analysis can only induce confusion.

It merits emphasis that the Court's resurrection of the unawareness factor is indispensable to its holding. For, in *Brewer,* substantial contact and conversation with a confined defendant preceded delivery of the "Christian burial speech." Yet the Court clearly deemed the speech critical in finding a *Massiah* violation; it thus made clear that mere "association" and "general conversation" did not suffice to bring *Massiah* into play. Since nothing more transpired here, principled application of *Brewer* mandates reversal of the judgment in this case.

Finally, the Court notes that Henry was incarcerated when he made his statements to Nichols. The Court's emphasis of the "subtle influences" exerted by custody, however, is itself too subtle for me. This is not a case of a custodial encounter with police, in which the Government's display of power might overcome the free will of the accused. The relationship here was "social" and relaxed. Henry did not suspect that Nichols was connected with the FBI. Moreover, even assuming that "subtle influences" might encourage a detainee to talk about his crime, there are certainly counterbalances of at least equal weight. Since, in jail, "official surveillance has traditionally been the order of the day,"

*Lanza* v. *New York*, 370 U. S. 139, 143 (1962), and a jailmate
has obvious incentives to assist authorities, one may expect
a detainee to act with corresponding circumspection. Cf.
*Rhode Island* v. *Innis*, 446 U. S., at 300, n. 4 ("Custody
in . . . a [*Massiah*] case is not controlling; indeed, the peti-
tioner in *Massiah* was not in custody").

The Court does more than rely on dubious factors in find-
ing that Coughlin's actions were "likely to induce" Nichols'
successful prompting of Henry; it fails to focus on facts
that cut strongly against that conclusion. The Court ignores
Coughlin's specific instruction to Nichols that he was not to
question Henry or to initiate conversation with him about the
robbery. Nor does it note Nichols' likely assumption that
he would not be remunerated, but reprimanded and possibly
penalized, if he violated Coughlin's orders. In addition, the
record shows that Nichols had worked as an FBI informant
for four years and that Coughlin and Nichols had worked
together for about a year on several matters. It makes
sense, given Nichols' experience and Coughlin's willingness
to renew their working relationship, to conclude that Nichols
would follow Coughlin's instruction. Finally, it is worth
noting that Henry was only one of several federal detainees
to whom Nichols was to pay attention; [9] this is not a case in

---

[9] The Court's suggestion to the contrary, see *ante,* at 271, n. 8, based on
three isolated segments of Coughlin's affidavit, exemplifies its treatment of
the record. The relevant portion of Coughlin's affidavit reads in full:

"Nichols advised that he was in the same cellblock as Billy Gale Henry as
well as with *other prisoners* who had Federal charges against *them.* I
recall telling Nichols at this time to be alert to any statements made by
*these individuals* regarding the charges against *them.* I specifically recall
telling Nichols that he was not to question Henry or *these individuals*
about the charges against *them,* however, if *they* engaged him in conversa-
tion or talked in front of him, he was requested to pay attention to *their*
statements. I recall telling Nichols not to initiate any conversations with
Henry regarding the bank robbery charges against Henry, but that if
Henry initiated the conversations with Nichols, I requested Nichols to pay

which officers singled out a specific target. On these facts, I cannot agree that Coughlin "must have known that [it was] likely" that Nichols would seek to elicit information from Henry.

Under the Court's analysis, it is not enough that Coughlin should have anticipated disobedience by Nichols; it must also be shown that his actions were "likely to induce" Henry to talk. In my view, however, there was little reason to believe that even the most aggressive efforts by Nichols would lead to disclosures by Henry. Nothing in the record suggests that Henry and Nichols knew each other, far less that they had the type of relationship that would lead Henry to discuss freely a crime for which he had not yet been tried. In this respect, the case stands in stark contrast to *Massiah,* where the informant had collaborated with Massiah in a drug smuggling operation and was a codefendant in the resulting and pending prosecution. Moreover, "[t]here is nothing in the record to suggest that . . . the [defendant] was peculiarly susceptible [to approaches by cellmates or that he] . . . was unusually disoriented or upset." *Rhode Island* v. *Innis,* 446 U. S., at 302–303. On these facts, it seems to me extremely *un*likely that Coughlin's actions would lead to Henry's statements.

Even though the test forged by the Court has no precedent, we are not without some assistance in judging its application. Just a few weeks ago, in *Rhode Island* v. *Innis,* the Court held that *Miranda* was implicated only by "words or actions on the part of police officers that they should have known were *reasonably likely* to elicit an incriminating response."

---

attention to the information furnished by Henry." App. to Pet. for Cert. 58a (emphases added).

Since the affidavit containing this statement was submitted in Henry's case, it is neither surprising nor significant that it occasionally refers to Henry by name, while not referring specifically to remarks Coughlin might have made about other detainees. The Court's reading of this passage as establishing that "the agent . . . singled out Henry as the inmate in whom the agent had a special interest" seems to me extraordinary.

446 U. S., at 302 (emphasis deleted and added). Here, the Court asks whether agents "creat[ed] a situation likely to induce Henry to make incriminating statements." *Ante*, at 274. Although the Court in *Innis* emphasized that the *Massiah* and *Miranda* rules are distinct, 446 U. S., at 300, n. 4, I have some difficulty in identifying a material difference between these formulations. Since the Court found its test not satisfied in *Innis*, it should follow that Henry's statements may be excluded only if there was greater reason in this case than in *Innis* to expect incriminatory disclosures. The case for finding that disclosures were "likely," however, was clearly stronger in *Innis*. There the defendant had just been arrested at 4:30 a. m.; he was handcuffed and confined in a "caged wagon"; and the three police officers accompanying him triggered his confession by conversing about the danger that a "little girl" attending a nearby school for the handicapped would "maybe kill herself" upon finding a gun he supposedly had hidden. *Id.*, at 293–295. Against the backdrop of *Innis*, I cannot fathom how the Court can conclude that Coughlin's actions rendered Henry's disclosures "likely."

B. *"Prompting."* All Members of the Court agree that Henry's statements were properly admitted if Nichols did not "prompt" him. *Ante*, at 273, and see *ante*, at 271, n. 9; *ante*, at 276 (concurring opinion); *post*, at 302 (dissenting opinion). The record, however, gives no indication that Nichols "stimulated" Henry's remarks, *ante*, at 273, with "affirmative steps to secure incriminating information." *Ante*, at 271. Certainly the known facts reveal nothing more than "a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations." *Ante*, at 276 (concurring opinion).[10] The scant record demonstrates only that Nichols "had 'an opportunity to have some

---

[10] Indeed, here, unlike the scenario sketched by MR. JUSTICE POWELL, there was no instruction "to engage . . . in some conversations." It would seem that, *a fortiori*, Henry's statements should not be excluded.

conversations with Mr. Henry while he was in the jail.' "
*Ante,* at 267. "Henry had engaged [Nichols] in conversa-
tion," "had requested Nichols' assistance," and "had talked to
Nichols about the bank robbery charges against him." App.
to Pet. for Cert. 58a. Thus, we know only that Nichols and
Henry had conversations, hardly a startling development,
given their location in the same cellblock in a city jail. We
know nothing about the nature of these conversations, par-
ticularly whether Nichols subtly or otherwise focused atten-
tion on the bank robberies. Indeed, to the extent the record
says anything at all, it supports the inference that it was
Henry, not Nichols, who "engaged" the other "in some con-
versations," and who was the moving force behind any men-
tion of the crime. I cannot believe that *Massiah* requires
exclusion when a cellmate previously unknown to the defend-
ant and asked only to keep his ears open says: "It's a nice
day," and the defendant responds: "It would be nicer if I
hadn't robbed that bank." The Court of Appeals, however,
found it necessary to swallow that bitter pill in order to decide
this case the way it did, and this Court does not show that
anything more transpired.

Conceivably, the amount of information purveyed by
Henry to Nichols could support an inference that some fishing
for detail occurred. The Court does not invoke this reason-
ing, however, and even if the record is stretched to produce
such a finding, it clearly discloses nothing about the *timing*
of Henry's disclosures. It may well be that Henry first "let
the cat out of the bag," either by volunteering statements or
by inadvertently discussing the crime with someone else
within earshot of Nichols. These possibilities are not far-
fetched. In addition to revealing Coughlin's instructions,
which we may infer were followed, the record specifically in-
dicates that Henry "volunteered" information about the rob-
bery to a cellmate other than Nichols. App. 85. Moreover,
the record discloses Henry's eagerness to make contact with a
potential collaborator outside the jail; Nichols, who was soon

to be released, was a logical choice to serve as a go-between. The Court, however, seems unconcerned that some of Henry's statements were "spontaneously given." 590 F. 2d 544, 549 (CA4 1978) (dissenting opinion). It emphasizes that "[i]n *Massiah,* no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation." *Ante,* at 271–272. This observation trivializes the central facts of *Massiah,* in which an agent arranged a bugged meeting between codefendants who shared a natural interest in their pending prosecution, and in which the informant was instructed to, and did, converse about the pair's misdeeds.

### III

In sum, I think this is an unfortunate decision, which disregards precedent and stretches to the breaking point a virtually silent record. Whatever the bounds of *Massiah,* that case does not justify exclusion of the proof challenged here.

MR. JUSTICE REHNQUIST, dissenting.

The Court today concludes that the Government through the use of an informant "deliberately elicited" information from respondent after formal criminal proceedings had begun, and thus the statements made by respondent to the informant are inadmissible because counsel was not present. The exclusion of respondent's statements has no relationship whatsoever to the reliability of the evidence, and it rests on a prophylactic application of the Sixth Amendment right to counsel that in my view entirely ignores the doctrinal foundation of that right. The Court's ruling is based on *Massiah* v. *United States,* 377 U. S. 201 (1964), which held that a postindictment confrontation between the accused and his accomplice, who had turned State's evidence and was acting under the direction of the Government, was a "critical" stage of the criminal proceedings at which the Sixth Amendment right to counsel attached. While the decision today sets forth the factors that are "important" in determining whether there

has been a *Massiah* violation, *ante,* at 270, I think that *Massiah* constitutes such a substantial departure from the traditional concerns that underlie the Sixth Amendment guarantee that its language, if not its actual holding, should be re-examined.

## I

The doctrinal underpinnings of *Massiah* have been largely left unexplained, and the result in this case, as in *Massiah,* is difficult to reconcile with the traditional notions of the role of an attorney. Here, as in *Massiah,* the accused was not prevented from consulting with his counsel as often as he wished. No meetings between the accused and his counsel were disturbed or spied upon. And preparation for trial was not obstructed. See 377 U. S., at 209 (WHITE, J., dissenting). In short, as MR. JUSTICE WHITE aptly observed in *Massiah:*

> "It is only a sterile syllogism—an unsound one, besides— to say that because [the accused] had a right to counsel's aid before and during the trial, his out-of-court conversations and admissions must be excluded if obtained without counsel's consent or presence. The right to counsel has never meant as much before, *Cicenia* v. *Lagay,* 357 U. S. 504; *Crooker* v. *California,* 357 U. S. 433, and its extension in this case requires some further explanation, so far unarticulated by the Court." *Ibid.*

## A

Our decisions recognize that after formal proceedings have commenced an accused has a Sixth Amendment right to counsel at "critical stages" of the criminal proceedings. See, *e. g., ante,* at 269. This principle derives from *Powell* v. *Alabama,* 287 U. S. 45 (1932), which held that a trial court's failure to appoint counsel until the trial began violated the Due Process Clause of the Fourteenth Amendment. *Id.,* at 68–71. *Powell* referred to the "critical period" as being "from the time of [the defendants'] arraignment until the beginning of

their trial, when consultation, thoroughgoing investigation and preparation were vitally important." *Id.*, at 57. During that period, the defendants in *Powell* "did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself." *Ibid.* They thus were deprived of the opportunity to consult with an attorney, and to have him investigate their case and prepare a defense for trial. After observing that the duty to assign counsel "is not discharged by an assignment at such time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case," *id.*, at 71, this Court held that the defendants had been unconstitutionally denied effective assistance of counsel.[1]

*Powell* was based on the rationale that an unaided layman, who has little or no familiarity with the law, requires assistance in the preparation and presentation of his case and in coping with procedural complexities in order to assure a fair trial. The Court in *Powell* stated:

"Historically and in practice, in our country at least, [a hearing] has always included the right to the aid of counsel when desired and provided by the party asserting the right. The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be

---

[1] The Court observed: "It is not enough to assume that counsel . . . precipitated into the case [on the morning of the trial] thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thoroughgoing investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given. Defendants were immediately hurried to trial. Chief Justice Anderson, after disclaiming any intention to criticize harshly counsel who attempted to represent defendants at the trials, said: '. . . The record indicates that the appearance was rather *pro forma* than zealous and active. . . .' Under the circumstances disclosed, we hold that defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities." 287 U. S., at 58.

heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel, he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect." *Id.,* at 68–69.[2]

More recently this Court has again observed that the concerns underlying the Sixth Amendment right to counsel are to provide aid to the layman in arguing the law and in coping with intricate legal procedure, *United States* v. *Ash,* 413 U. S. 300, 307–308 (1973), and to minimize the imbalance in the adversary system that otherwise resulted with the creation of the

---

[2] This rationale has also been applied to the arraignment, where "[a]vailable defenses may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes," *Hamilton* v. *Alabama,* 368 U. S. 52, 54 (1961), and to a preliminary hearing, where such defenses may similarly be lost when the accused enters his plea. *White* v. *Maryland,* 373 U. S. 59 (1963). See also *United States* v. *Wade,* 388 U. S. 218 (1967) (lineup); *Mempa* v. *Rhay,* 389 U. S. 128 (1967) (combination probation-revocation and sentencing hearing); *Coleman* v. *Alabama,* 399 U. S. 1 (1970) (preliminary examination); *Moore* v. *Illinois,* 434 U. S. 220 (1977) (one-person showup at a hearing, which combined the functions of a preliminary arraignment and preliminary examination, that was adversary in nature and at which the accused was entitled to move for suppression of evidence and dismissal of charges).

professional prosecuting official. *Id.*, at 308–309.[3] Thus, in examining whether a stage of the proceedings is a "critical" one at which the accused is entitled to legal representation, it is important to recognize that the theoretical foundation of the Sixth Amendment right to counsel is based on the traditional role of an attorney as a legal expert and strategist.[4]

"Deliberate elicitation" after formal proceedings have begun is thus not by itself determinative. *Ash* held that an accused has no right to be present at a photo display because there is no possibility that he "might be misled by his lack of familiarity with the law or overpowered by his professional adversary." *Id.*, at 317. See also *Gilbert* v. *California*, 388 U. S. 263, 267 (1967) (taking of handwriting exemplars is not a "critical" stage of the proceedings because "there is a minimal risk that the absence of counsel might derogate from his right to a fair trial"). If the event is not one that requires knowledge of legal procedure, involves a communication between the accused and his attorney concerning investigation of the case or the preparation of a defense, or otherwise interferes with the attorney-client relationship, there is in my view simply no constitutional prohibition against the use of incriminating

---

[3] As this Court stated in *Ash*, the "historical background suggests that the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." 413 U. S., at 309. The English common-law rule, which severely limited the right of a person accused of a felony to consult with counsel, was apparently rejected by the Framers' as inherently irrational. *Id.*, at 306–307.

[4] Any dealings that an accused may have with his attorney are of course confidential, and anything the accused says to his attorney is beyond the reach of the prosecution. But this Court has never held, nor does it hold today, that a confrontation or stage of the proceedings is critical because it may lead to the accused's conviction. Rather, the test under the Sixth Amendment as recognized in *Ash* "call[s] for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Id.*, at 313.

information voluntarily obtained from an accused despite the fact that his counsel may not be present. In such circumstances, the accused at the least has been informed of his rights as required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and often will have received advice from his counsel not to disclose any information relating to his case, see, *e. g., Brewer* v. *Williams,* 430 U. S. 387 (1977).

Once the accused has been made aware of his rights, it is his responsibility to decide whether or not to exercise them. If he voluntarily relinquishes his rights by talking to authorities, or if he decides to disclose incriminating information to someone whom he mistakenly believes will not report it to the authorities, cf. *Hoffa* v. *United States,* 385 U. S. 293 (1966), he is normally accountable for his actions and must bear any adverse consequences that result. Such information has not in any sense been obtained because the accused's will has been overborne, nor does it result from any "unfair advantage" that the State has over the accused: the accused is free to keep quiet and to consult with his attorney if he so chooses. In this sense, the decision today and the result in *Massiah* are fundamentally inconsistent with traditional notions of the role of the attorney that underlie the Sixth Amendment right to counsel.

To the extent that *Massiah* relies on *Powell* v. *Alabama,* 287 U. S. 45 (1932), in concluding that the confrontation in that case was a "critical" stage of the proceedings, 377 U. S., at 205, *Massiah* reads the language of *Powell* out of context. In *Powell,* the period between arraignment and trial was critical because the defendants had no opportunity whatsoever to consult with an attorney during that time, and thus they were altogether deprived of legal assistance in the investigation of their case and the preparation of a defense. The Court today similarly takes an overly broad view of the stages after the commencement of formal criminal proceedings that should be viewed as "critical" for purposes of the Sixth Amendment. And it is not amiss to point out that *Powell* was decided solely

on the basis of the Due Process Clause of the Fourteenth Amendment long before the Court selected the Sixth Amendment as one that the Fourteenth Amendment "incorporated" and made applicable against the States as well as the United States. See *Gideon* v. *Wainwright,* 372 U. S. 335 (1963).

## B

*Massiah* also relied heavily on a concurring opinion of its author in *Spano* v. *New York,* 360 U. S. 315 (1959), which expressed the notion that the adversary system commences with indictment, and should be followed by arraignment and trial. *Id.,* at 327 (STEWART, J., concurring). *Spano,* however, was a coerced confession case in which the accused was interrogated for eight hours after he had been indicted until he confessed. While it is true that both the Fifth and Sixth Amendments reflect the Framers' intent to establish essentially an accusatory rather than an inquisitorial system of justice, neither suggests by its terms a rigid dichotomy between the types of police activities that are permissible before commencement of formal criminal proceedings and those that are subsequently permissible. More specifically, there is nothing in the Sixth Amendment to suggest, nor does it follow from the general accusatory nature of our criminal scheme, that once the adversary process formally begins the government may not make any effort to obtain incriminating evidence from the accused when counsel is not present. The role of counsel in an adversary system is to offer advice and assistance in the preparation of a defense and to serve as a spokesman for the accused in technical legal proceedings. And the Sixth Amendment, of course, protects the confidentiality of communications between the accused and his attorney. But there is no constitutional or historical support for concluding that an accused has a right to have his attorney serve as a sort of guru who must be present whenever an accused has an inclination to reveal incriminating information to anyone who acts to elicit such information at the

behest of the prosecution. To the extent the accused is protected from revealing evidence that may be incriminatory, the focus must be on the Fifth Amendment privilege against compulsory self-incrimination. See, *e. g., Spano* v. *New York, supra; Brown* v. *Mississippi*, 297 U. S. 278 (1936); *Ashcraft* v. *Tennessee*, 322 U. S. 143 (1944).[5]

## C

The objectives that underlie the exclusionary rule also suggest that the results reached in *Massiah* and the decision today are incorrect. Although the exclusion of reliable, probative evidence imposes tremendous costs on the judicial process and on society, see, *e. g., Stone* v. *Powell*, 428 U. S. 465 (1976), this Court has nonetheless imposed a rule for the exclusion of such evidence in some contexts in order to deter unlawful police activity. See, *e. g., Weeks* v. *United States*, 232 U. S. 383 (1914); *Mapp* v. *Ohio*, 367 U. S. 643 (1961). In cases in which incriminating statements made by the accused are entirely voluntary, however, and the government has merely encouraged a third party to talk to the accused and report any incriminating information that the accused might reveal, there is in my view no valid justification for the exclusion of such evidence from trial.[6]

---

[5] Whatever may be the appropriate role of counsel in protecting the accused's privilege against *compulsory* self-incrimination, see, *e. g., Fare* v. *Michael C.*, 442 U. S. 707, 719 (1979), when, as in this case, the accused merely engages in conversation with someone whom he does not know to be a governmental agent, the hazards of coercion and governmental overreaching are entirely absent.

[6] As stated by MR. CHIEF JUSTICE BURGER in his dissenting opinion in *Brewer* v. *Williams*, 430 U. S. 387, 421–422 (1977):

"[U]nlawfully obtained evidence is not automatically excluded from the factfinding process in all circumstances. In a variety of contexts we inquire whether application of the rule will promote its objectives sufficiently to justify the enormous cost it imposes on society. 'As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.' *United*

Ordinary citizens are expected to report any criminal activity they might observe, and they are often required under pain of compulsory process to reveal information that may incriminate others, even their friends and relatives. It generally does not matter that the information was obtained as a result of trust or confidence that develops from friendship or family ties. The incriminating information may still be obtained through use of the subpoena power, and in many instances of course it will be voluntarily revealed by the citizen interested in the enforcement of the laws.

In cases such as this one and *Massiah*, the effect of the governmental action is to encourage an informant to reveal information to the authorities that the ordinary citizen most likely would reveal voluntarily. While it is true that the informants here and in *Massiah* were encouraged to "elicit" the information from the accused, I doubt that most people would find this type of elicitation reprehensible. It involves merely engaging the accused in conversation about his criminal activity and thereby encouraging him voluntarily to make incriminating remarks. There is absolutely no element of coercion, nor is there any interference whatsoever with the attorney-client relationship. Anything the accused might reveal to the informant should, as with revelations he might make to the ordinary citizen, be available for use at trial. This Court has never held that an accused is constitutionally protected from his inability to keep quiet, whether or not he has been encouraged by third-party citizens to voluntarily make incriminating remarks. I do not think the result should be different merely because the government has encouraged a third-party informant to report remarks obtained in this fashion. When an accused voluntarily chooses to make an incriminatory re-

*States* v. *Calandra*, [414 U. S. 338, 348 (1974)]; accord, *Stone* v. *Powell, supra,* at 486–491; *United States* v. *Janis*, [428 U. S. 433 (1976)]; *Brown* v. *Illinois*, 422 U. S. 590, 606–608–609 (1975) (POWELL, J., concurring in part); *United States* v. *Peltier*, [422 U. S. 531, 538–539 (1975)]." (Footnote omitted.)

mark in these circumstances, he knowingly assumes the risk that his confidant may be untrustworthy.[7]

## II

In holding that the Government has "deliberately elicited" information from the accused here, the Court considers the following factors to be relevant:

> "First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols." *Ante,* at 270.

I disagree with the Court's evaluation of these factors, and would conclude that no deliberate elicitation has taken place.

## A

The Court acknowledges that the use of undercover police-work is an important and constitutionally permissible method of law enforcement. *Ante,* at 272. As the Court observes, *Hoffa* v. *United States,* 385 U. S., at 302, for example, recognizes that the Constitution affords no protection to "a wrong-doer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it," even if that person is an undisclosed informer. And in *Weatherford* v. *Bursey,* 429 U. S. 545, 557 (1977), we acknowledged the "necessity of undercover work" and "the value it often is to effective law enforcement." See also, *e. g., United States* v. *Russell,* 411 U. S. 423, 432 (1973); *United States* v. *White,* 401 U. S. 745, 752 (1971).

---

[7] Cf. *United States* v. *White,* 401 U. S. 745, 752 (1971), where this Court stated:

"Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his."

The Court nonetheless holds that once formal criminal proceedings have commenced, such undercover activity in some circumstances may not be constitutionally permissible even though it leads to incriminating statements by an accused that are entirely voluntary and inherently reliable. The reason for this conclusion is not readily apparent from the Court's opinion.

The fact that police carry on undercover activities should not automatically be transmuted because formal criminal proceedings have begun. It is true that once such proceedings have commenced, there is an "adversary" relationship between the government and the accused. But an adversary relationship may very well exist prior to the commencement of formal proceedings. And, as this Court has previously recognized, many events, while perhaps "adversarial," are not of such a nature that an attorney can provide any special knowledge or assistance to the accused as a result of his legal expertise. See, e. g., United States v. Ash, 413 U. S. 300 (1973) (no right to an attorney at pretrial photographic identifications at which the accused is not present); Gilbert v. California, 388 U. S., at 267 (no right to an attorney at taking of handwriting exemplars). When an attorney has no such special knowledge or skill, the Sixth Amendment does not give the accused a right to have an attorney present.

In addition, the mere bringing of formal proceedings does not necessarily mean that an undercover investigation or the need for it has terminated. A person may be arrested on the basis of probable cause arising in the immediate aftermath of an offense and during early stages of investigation, but before the authorities have had an opportunity to investigate fully his connection with the crime. And for the criminal, there is no rigid dichotomy between the time before commencement of formal criminal proceedings and the time after such proceedings have begun. Once out on bail the accused remains free to continue his criminal activity, and very well may decide to do so. See, e. g., Rogers v. United States, 325

F. 2d 485 (CA10 1963), cited in *Massiah* v. *United States*, 377 U. S., at 212 (WHITE, J., dissenting). Indeed, in *Massiah* itself there was evidence that after indictment one of the defendants attempted to persuade a Government agent to go into the narcotics business with him. *Id.*, at 212–213 (WHITE, J., dissenting). As the Court stated in *Massiah:* "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted." *Id.*, at 207. I would hold that the Government's activity here is merely a continuation of its lawful authority to use covert operations in investigating a criminal case after formal proceedings have commenced.[8]

## B

The Court secondly states that here the informant ostensibly was no more than a fellow inmate, and thus the conversation "stimulated" by him may lead the accused to communicate information that he would not intentionally reveal to persons known to be government agents, who are "arm's-length" adversaries. While the Court deems relevant the question whether the informant took active steps as a result of a prearranged deal with the Government to elicit incriminating information from the accused, *ante,* at 273,[9] I do not think this

---

[8] I also disagree with the Court that the fact that Nichols was a paid informant and on a contingency fee is relevant in making this determination. See *ante,* at 270.

[9] It bears emphasis that even under the Court's holding today affirmative steps to induce the accused to reveal incriminating information are required before there can be a "deliberate" elicitation in violation of the Sixth Amendment. As noted by MR. JUSTICE POWELL in his concurring opinion:

"*Massiah* does not prohibit the introduction of spontaneous statements that are not elicited by governmental action. Thus, the Sixth Amendment is not violated when a passive listening device collects, but does not induce, incriminating comments. See *United States* v. *Hearst,* 563 F. 2d 1331, 1347–1348 (CA9 1977), cert. denied, 435 U. S. 1000 (1978). Similarly, the

type of encounter is one that is properly viewed as a critical stage at which counsel is necessary to provide guidance or protection to the accused to enable him to cope with unfamiliar legal proceedings, or to counterbalance the expertise of a professional prosecutor. Rather, as previously discussed, when the accused voluntarily reveals incriminating information to a third party in this context, I do not think there is any justification for excluding his admissions from trial, whether or not the third party was acting at the behest of the prosecution.

## C

Finally, the Court considers relevant the fact that because the accused is confined and in custody, "subtle influences" are present "that will make him particularly susceptible to the ploys of undercover agents." *Ante,* at 274. An appeal to an accused's conscience or willingness to talk, however, does not in my view have a sufficiently overbearing impact on the accused's will to warrant special constitutional protection.

In the instant case, for example, if the informant had been in the cell next to respondent and overheard him make incriminating statements to his cellmate, no Sixth Amendment violation would have occurred. See, *e. g., United States* v. *Hearst,* 563 F. 2d 1331, 1347–1348 (CA9 1977), cert. denied, 435 U. S. 1000 (1978). In such circumstances it would be clear that the Government had engaged in no affirmative conduct spe-

---

mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional. In such a case, the question would be whether the informant's actions constituted deliberate and 'surreptitious interrogatio[n]' of the defendant. If they did not, there would be no interference with the relationship between client and counsel." *Ante,* at 276.

Deliberate elicitation does not and cannot depend on the subjective intention of the government or its informant to obtain incriminatory evidence from the accused within the limits of the law. Such an intention of course is the essence of conscientious policework.

cifically designed to extract incriminating statements from the accused. The same would be true if the accused made a statement that a prison guard happened to overhear. See, *e. g.*, *United States* v. *Barfield,* 461 F. 2d 661 (CA5 1972). I think there likewise is no Sixth Amendment violation when the accused's cellmate initiates conversation with him, and the accused makes incriminatory admissions. The fact that the cellmate is an informant has no impact on the accused, because the informant appears to him to be an ordinary cellmate. Whether the accused makes any statements is therefore dependent on his own disposition to do so, despite the fact that he is confined in a cell.

### III

Finally, I disagree with the Court's reading of the facts, though that reading obviously narrows the scope of its holding. Here the District Court found that the Government did not employ Nichols to question respondent or to seek information from him, but merely to report what he heard. The Government had no part in having Nichols placed in the jail cell with respondent. App. to Pet. for Cert. 39a. And the record in my view fails to support the conclusion that Nichols engaged in any affirmative conduct to elicit information from respondent. The Court of Appeals did not either explicitly or implicitly find to the contrary. Thus, this Court's factual conclusions are not supported by the findings of the District Court. I consequently would conclude, as did the District Court, that here respondent has not been denied his Sixth Amendment right to counsel.

For the foregoing reasons, I would reverse the judgment of the Court of Appeals.