THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
PAUL BAKER, Defendant-Appellee.

First District (3rd Division)   Nos. 82—0123, 83—0005 cons.

Opinion filed March 20, 1985.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Jeanette Sublett, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellee.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

Defendant, Paul Baker, was charged in a six-count information with armed violence, aggravated battery and attempted murder of Cornelio Cruz and Angie Stoklasa. After a jury trial he was found guilty on all counts and sentenced to a term of 40 years for attempted murder and a term of 25 years for armed violence, the sentences to

be served consecutively. Defendant filed petitions seeking a new trial under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1981, ch. 38, par. 122—1 *et al.*) and under former section 72 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 72). The trial court granted both petitions and ordered a new trial. From this order the State has appealed; defendant has appealed his conviction. We consolidated the appeals.

The principal issue in the direct appeal is whether the trial court erred in permitting two Federal Bureau of Investigation (FBI) informants to testify as to post-indictment admissions made by the defendant in conversations with them and in admitting into evidence a taped recording of one of those conversations. All of the conversations were had after defendant had retained counsel and outside his attorney's presence. Defendant contends that this evidence was illegally obtained and was admitted into evidence in violation of his right to counsel under the sixth amendment, citing *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199.

Paul Baker was indicted on April 29, 1981. The next day attorney Dean Wolfson filed his appearance. Wolfson was later replaced by other lawyers, and throughout the proceedings, Baker had counsel of record. Beginning in late September 1981, two FBI informants, James Galvin and Sherry Galvin, had conversations with Baker outside the presence of his attorneys and without his attorneys' knowledge. Andrew Caster, a special agent with the FBI, testified that he had known the Galvins since 1980 and that they had provided him with information over that period. During the month of November 1981, he visited or talked with them by telephone two or three times a day, and on the 17th of November he obtained a court order authorizing him to make a "body recording" of conversations between the Galvins and Baker. That day he placed a recording device on James Galvin and recorded the conversation the Galvins had with Baker. A taped recording of that conversation was admitted into evidence.

Both Galvins testified to a series of conversations had with Baker during the months of September, October and November 1981, in which he admitted the unsuccessful attempt to kill Angie Stoklasa and Cornelio Cruz, of which he is charged in the instant case. In addition, Baker admitted the later fatal shooting of Cruz, and he shared with James Galvin his plan to kill a witness. All of this was told to the FBI. In *Massiah*, the United States Supreme Court held that incriminating post-indictment statements obtained by Federal agents from a defendant in the absence of his attorney deprived him of his right to counsel under the sixth amendment, and therefore such statements

could not constitutionally be used as evidence against him at trial.

The State, in an unsuccessful effort to remove this case from the ambit of *Massiah*, makes several contentions. The reply brief states: "The People maintain that the court properly allowed the conversation which took place between defendant and Sherry and Jim Galvin into evidence as they were voluntary admissions of guilt." This fails to distinguish the instant case from *Massiah*, because this was also true of the admissions in *Massiah*. Indeed, the dissenters in *Massiah* observed that the rule announced by the majority "would exclude all admissions made to the police, [in absence of counsel] no matter how voluntary and reliable ***." *Massiah v. United States* (1964), 377 U.S. 201, 209, 12 L. Ed. 2d 246, 252, 84 S. Ct. 1199, 1204.

The State points out that neither of the Galvins received any money for the information concerning the defendant, but cite no case in which that was a critically relevant factor. In *Massiah*, the informant, Colson, was a codefendant who decided to cooperate with the government. The court did not discuss his motivation or whether or not he was paid. Here, James Galvin testified that he had been supplying information to the FBI for two years, and had been paid about $600. He and his wife had received no money for the information supplied against Baker, but they were promised that they would be relocated. We fail to see how these facts provide an answer to the charge in defendant's petitions that he was deprived of his sixth amendment right to counsel.

The State contends that "[d]efendant's voluntary statements to the Galvins can hardly have been said to have been part of a 'deliberate and designed' attempt to elicit incriminatory information from defendant. Indeed, most of the information was volunteered by defendant without any questioning or coercion by the Galvins." This argument was rejected by the Illinois Supreme Court in *People v. Lagardo* (1968), 39 Ill. 2d 614, 616, 237 N.E.2d 484:

> "There has been some difference of opinion by the courts of this country as to whether the *Massiah* doctrine operates to exclude only incriminating post-indictment statements which are induced or deliberately elicited by police officers in the absence of counsel. However, we have interpreted *Massiah* to exclude all post-indictment incriminating statements obtained in the absence of counsel, even when not deliberately elicited by interrogation or induced by misapprehension engendered by trickery or deception. (*People v. Milani*, 39 Ill. 2d 22, 27; see *Mathis v. United States*, 36 L.W. 4379.)"

In our opinion, the issue of the admissibility of defendant's post-

indictment conversations is controlled by *Massiah,* and it was error to admit that evidence. The State contends that the admission, if error, was harmless error.

Aside from the testimony regarding defendant's post-indictment conversations, the State's evidence included the following: testimony which placed defendant shortly after the shooting standing coatless in an alley near the scene of the crime; two guns found in a trash can wrapped in a jacket a few feet from where defendant was standing; and the courtroom identification by Angie Stoklasa. We are aware that the positive identification of one eyewitness is sufficient to sustain a conviction. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.) However, the test to be applied to these post-conviction petitions is whether we can say beyond a reasonable doubt that the testimony which we find was improperly admitted did not influence the jury's verdict. *United States v. Henry* (4th Cir. 1978), 590 F.2d 544, *affirmed* (1980), 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183.) Under the facts of this case we cannot.

■■ The prejudice caused by the admission of the informant testimony was compounded by the fact, as defendant charges in his post-conviction petitions, that both of his trial counsel had a *per se* conflict of interest which deprived him of his right to the effective assistance of counsel. We agree. The cases cited by the prosecution in reference to this point involve conflict between defense counsel's loyalty to third parties and the duty to represent defendant. The instant case is worse. It involves conflicts between attorneys' duties to their client on trial and their own personal interests, indeed, perhaps their penal interests. The conflict became evident when Baker's attorney, Charles Schwartz, testified at a post-conviction hearing that he did not call police officer J. Hanrahan to testify at Baker's trial, although he knew that the officer's testimony would impeach the State's only identification witness. Schwartz testified that he believed that if he did not call Hanrahan, he himself would escape investigation and possible prosecution on the State or Federal level. Defendant's section 72 petition points out the significance of the failure to call Officer Hanrahan to testify in the instant case, making this allegation:

"Petitioner was recently tried for the murder of Cornelio Cruz at a jury trial before the Honorable James M. Bailey in Case No. 81 C 9446. The jury acquitted Petitioner of all charges. During the trial Officer J. Hanrahan of the Chicago Police, Star No. 11799, testified that he interviewed Angela Stoklasa on the morning of April 19, 1981, at St. Mary's Hospital. At that time she told him that she would be unable to identify her assailant.

Angela Stoklasa would later testify at the trial in this case that Paul Baker was the assailant. Officer Hanrahan did not testify at the trial."

Officer Hanrahan at the post-conviction hearing testified that he asked Angela Stoklasa at the hospital if she could say whether the assailant was male or female and she said that she could not. Officer Hanrahan said he was subpoenaed to the attempted murder trial as a witness but was not called to testify. That day he told Baker's attorney, Charles Schwartz, and Assistant State's Attorney McCurry that Angela Stoklasa could not make an identification.

Attorney Schwartz testified at the post-conviction hearing that Hanrahan "indicated that his sense was that she had not seen anything" and predicated on that he definitely planned to call him as a witness on behalf of Baker.

Schwartz and his co-counsel, Martin Schachter, both testified as to the bizarre circumstances which led to the change in plans and to their decision not to call Officer Hanrahan. Schwartz testified that at about 11 p.m. on November 18, 1981, he got a phone call from Schachter. Schachter told him that Jeffrey Kent, chief of special prosecutions in the State's Attorney's office, had called to inform him that Baker had been arrested by the FBI for the murder of Cruz, and that the FBI had tapes on which Baker claimed to have "paid off" some policemen. Later, when Schwartz spoke to Kent, Kent told him that the FBI tapes contained claims that Baker had bribed lawyers, judges and the police. Schwartz recalled that Kent had not actually accused him of bribery, but had not given him a "clean bill of health" either, and that the matter was left "hanging in the air." After several more conversations with Schachter, Kent and Assistant State's Attorney Frank DiBoni, Schwartz agreed to a meeting in Kent's office the next morning. At the meeting with several representatives of the State's Attorney's office, Schwartz explained why he had planned to call Officer Hanrahan. He also told the group that he felt he was "under suspicion," and then discussed a letter he had drafted to Judge Close stating that because he might be subject to State or Federal prosecution, a conflict of interest existed between his own interests and those of his client. The assistant State's Attorneys suggested that the letter not be given to the judge and that the defense not call any police officers. Schwartz testified that he agreed to these suggestions and had a "sense impression" that as *quid pro quo* he and Schachter were "off the hook" as far as the State was concerned and would not be subject to any further inquiry. Schwartz testified that he had made a "conscious decision" not to "suborn perjury," but his agreement not to call

any police officers was the product of "intimidation" by the assistant State's Attorneys and certain unnamed agents of the FBI who sat in the courtroom during the trial.

Schwartz testified that after the meeting he told Baker that he would not call any police officers but did not tell him about his "deal" with the State. He testified that he believed that the State's Attorneys were trying to plant a little "seed," saying, in effect, "[g]o down there and save yourselves. Schwartz and Schachter go out there and sell your client out so that you will get a free pass and we'll get Baker and we'll get any coppers that Baker had taken care of." Schwartz explained that he was afraid that Baker would "point the finger" at his lawyers and insist that he did not want to bribe anyone, and that he thought Kent was aware of this situation. The judge asked Schwartz why there had been no cross-examination of the Galvins about possible "prepping," to which Schwartz responded, "I can't tell you that. We were so unnerved that I think our ability to function as lawyers was diminished."

Later in the proceedings, Schwartz' co-counsel, Martin Schachter, was called as a court's witness. According to Schachter, when he first spoke to Kent, Kent told him, *inter alia*, that his office was suspicious as to how he and Schwartz had become involved in Baker's case because Baker's first attorney had a reputation for fixing cases. When Schachter denied any connection, Kent stated, "[W]ell, that may be true, or it may not be true."

Schachter's testimony concerning calls and conversations had on November 18, 1981, by and large paralleled that of Schwartz. He described the conflicting position in which these conversations had put him and Schwartz in these words when questioned by the court:

"Q. Spell out that conflict.

A. *** We were conducting the defense with a gun at our heads and under those situations we could not really represent the defendant adequately because of our state of mind, and also on the fact that it was a catch twenty-two, we were damned if we called the witnesses, the detectives, and we were damned if we didn't. We were put in this position not by us but because of other people.

Q. Well, is that what you considered to be the conflict, alleged intimidation by you through the office of the special prosecution, Mr. Kent and others suggesting that certain matters have been developed evidentiary wise by the Federal Bureau of Investigation and possibly their office inculpating you in a criminal act as it relates to the conduct of the defense of this case?

A. Yes, there was, basically, as far as our determination as to the conflict of representing the defendant."

In addition to this testimony, defendant, at the post-conviction hearing, presented evidence not relevant to the claims made here of a *Massiah* defense and the lack of representation by counsel at trial.

In response, the State submitted affidavits of assistant State's Attorneys in which they all denied the allegations made by Schwartz that the office of the State's Attorney contributed to the decision of defense counsel not to call Officer Hanrahan to testify. These affidavits were admitted into evidence and the State rested.

The issue in this case is whether defendant's lawyers had a conflict of interest depriving him of his constitutional right to effective assistance of counsel. The issue is not whether the assistant State's Attorneys contributed to the defense's decision not to call Officer Hanrahan. Where the issue is whether defendant was deprived of his right to effective assistance of counsel, by his counsel's conflict of interest, it is irrelevant whether the prosecution caused or induced the conflict of interest. "[I]n many, if not most, instances a prosecutor has no knowledge of, and, indeed, is probably powerless to avoid, a situation wherein the person he is prosecuting, by his or her own actions, retains an attorney who subsequently puts himself in a conflict-of-interest situation with his client, resulting, as here, in the reversal of a conviction against defendant." *People v. Coslet* (1977), 67 Ill. 2d 127, 136, 364 N.E.2d 67.

The State argues that defendant's counsel vigorously and ably conducted the defense and that the failure to call Officer Hanrahan was a matter of trial strategy. The ruling of the Illinois Supreme Court in *People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441, is dispositive of that argument:

" '[H]is [defendant's] right to counsel under the Constitution is more than a formality, and to allow him to be represented by an attorney with such conflicting interests as existed here without his knowledgeable consent is little better than allowing him no lawyer at all. [Citations.] This situation is too fraught with the dangers of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of relator's rights *whether or not it in fact influences the attorney or the outcome of the case.*' " (Emphasis added.) 40 Ill. 2d 109, 112-13.

■ The State argues that defendant waived the issue of his right to the effective assistance of counsel "by failing to raise it either at trial, in his motion for a new trial *** or in his petitions for post-con-

viction relief." A review of the record shows that defendant's motion for a new trial was filed by attorney Martin Schachter. To hold that defendant waived his right to the effective assistance of counsel because that point was not raised in the motion for a new trial filed by the counsel whose effectiveness is questioned would be cruelly ironic. The sixth amendment denial is raised in the petition for post-conviction relief, which was filed by another lawyer and granted by the trial court. The record is clear that defendant attempted to fire his lawyers who had the conflict of interest; the lawyers so advised the court and made a motion to withdraw, but it was denied. From these facts it is impossible to extrapolate a waiver. Our supreme court said in *People v. Fife* (1979), 76 Ill. 2d 418, 423, 392 N.E.2d 1345:

> "As this court noted in *People v. Stoval* (1968), 40 Ill. 2d 109, *Glasser v. United States* (1942), 315 U.S. 60, 69-70, 86 L. Ed. 680, 699, 62 S. Ct. 457, 464-65, determined that the 'right to the effective assistance of counsel is a fundamental right and entitles the person represented to the undivided loyalty of counsel.' [Citation.] This is a right which demands indulging 'every reasonable presumption against *** [its] waiver.'" (76 Ill. 2d 418, 423.)

We hold there is no waiver here.

"At a post-conviction hearing as in other court proceedings to determine facts without a jury, whether to believe testimony, wholly or partially or not at all, is for the trial judge who hears and sees the witnesses. Unless it appears his determination manifestly was erroneous, it will not be disturbed when reviewed." (*People v. Logue* (1970), 45 Ill. 2d 170, 174, 258 N.E.2d 323.) The trial judge in the instant case conducted an extensive post-conviction hearing which extended over several days. He heard and saw the witnesses and evaluated their testimony, particularly that of trial counsel, and found that they, to serve their own interests, failed to give defendant an unfettered, wholehearted defense. The court found that Officer Hanrahan was not called to testify because of this conflict and that with his testimony the trial result could have been different. It cannot be said that this determination was manifestly erroneous. We therefore affirm the order granting defendant a new trial. This order makes it unnecessary to pass upon the direct appeal. However, upon retrial the court should be guided by the *Massiah* principles set forth in this opinion.

Order affirmed.

McNAMARA and McGILLICUDDY, JJ., concur.