<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1351

                         UNITED STATES,

                           Appellee,

                               v.

                    JOS
LUIS LOZADA-RIVERA
                   a/k/a SEALED DEFENDANT 1,

                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

         [Hon. Hctor M. Laffitte, U.S. District Judge]

                             Before

                     Lynch, Circuit Judge,
                Bownes, Senior Circuit Judge,
                  and Lipez, Circuit Judge.
                                
                                
                                
                                
    Francisco Rebollo-Casalduc, with whom Nachman, Guillemard &
Rebollo, was on brief for appellant.

    Louis M. Fischer, Attorney, United States Department of
Justice, with whom Guillermo Gil, United States Attorney, was on
brief for appellee.

May 27, 1994

                                
                                

 BOWNES, Senior Circuit Judge.  Defendant-appellant Jos
Luis Lozada-Rivera ("Lozada") challenges his criminal conviction
for conspiracy to distribute cocaine and possession of cocaine with
intent to distribute.  He raises several issues on appeal,
including asserted defects in the trial court's evidentiary rulings
and its instructions to the jury.  We address only two of his
weightiest claims:  that the trial judge erred in admitting into
evidence a federal agent's report containing his version of
apparently incriminating statements made by defendant during a
post-arrest interview; and that the court improperly permitted a
government witness to testify that Lozada had recently asked him to
alter his testimony.  We reverse and remand for a new trial on both
scores.   
 The court should not have allowed the jury to consider
the contents of the report, either for the truth of the matter
asserted therein or for a more limited rehabilitative purpose.  
And, as the government now concedes, the court should not have
permitted testimony about Lozada's jailhouse remarks elicited in
violation of his Sixth Amendment right to counsel.  We conclude
that neither of these errors was harmless.
                               I
 On February 19, 1997, a federal grand jury indicted
Lozada and three others on one count of conspiracy to traffic
cocaine, 21 U.S.C.  846, and four counts of possession with intent
to distribute,  21 U.S.C.  841(a)(1).  His fellow co-defendants
pled out before trial; Lozada opted to take his chances with a jury
of his peers.
 During the course of his nine-day trial in September
1997, the government introduced substantial evidence of a scheme to
transport several hundred kilograms of cocaine from Puerto Rico to
the New York metropolitan area.  The evidence established that the
drug trafficking operation, with a few minor variations, worked in
the following manner:  Members of a transportation group received
the cocaine from Colombian suppliers in Puerto Rico and delivered
it to a warehouse owned by Lozada.  Once at the warehouse, they
would elaborately repackage the cocaine by concealing it in cargo
containers containing corn oil, coconuts, syrup, and other food
stuff.  The narcotics were then smuggled to New York masked as
legitimate products.  
 Jairo Rodrguez-Zuluaga ("Rodrguez"), who served as the
liaison between the transportation group and the Colombian
suppliers, would usually assist in the repackaging process and then
travel to New York to receive the shipment.  The conspirators later
met in a hotel in New Jersey to be paid for their labor.  This
entire process was repeated several times between 1994 and 1996.  
The responsible parties transported some 100-800 kilograms of
cocaine from Puerto Rico to New York in this fashion.
 The government advanced a theory of the case according to
which Lozada and Carlos Rosario-Matos ("Rosario") jointly headed
the transportation group and, after Rosario's arrest in 1995,
Lozada assumed full control of the unit.  As the government's
witnesses told it, for each shipment Lozada secured the necessary
cargo containers, prepared the shipping paperwork (listing "Loza
Foods" as the putative shipping company), and purchased the
legitimate items ultimately used to fill the containers and conceal
the cocaine.  Lozada operated Las Vegas Brands, Inc., a food
products import-export company based in Puerto Rico, whose supplies
and property were used for the repackaging activities of the
transportation group.  The prosecutor tendered other circumstantial
evidence of Lozada's guilt:  he made certain suspiciously large
cash deposits into his business account, kept sizeable sums of cash
nearby, and made seemingly extravagant expenditures for a person of
relatively modest means.
 Three cooperating witnesses tied Lozada to the conspiracy
(a fourth stated that he saw Lozada at a meeting where the elements
of the scheme were discussed).  Rosario, who originally established
contact with the Colombian suppliers on his own, testified that
Lozada got involved after the first shipment, and that he
thereafter shared half his profits from future shipments with
Lozada.  
 Rodrguez, the go-between, stated that he saw Lozada, who
he knew as "Don Millin," present at repackaging sessions and that
Lozada showed up to get paid on at least one occasion.  Abelardo
Torres-Padilla ("Torres"), too, placed Lozada in the general
vicinity of the warehouse when the cocaine was being placed in the
containers, and claimed that he informed Lozada by telephone that
a July 1995 shipment had been seized by Customs agents.  Over
strong objections by the defense, Torres also testified that the
night before he was to take the stand, Lozada offered him money if
he would change his testimony (the two were housed in the same
detention facility).   
 The centerpiece evidence of Lozada's involvement in the
conspiracy, however, were certain incriminating statements
allegedly uttered by Lozada on the day of his arrest when he
initially opted to cooperate with the authorities.  The government
urged the jury to view these comments purportedly made in the
presence of federal law enforcement officers, including Drug
Enforcement Agency ("DEA") Agent Rafael E. Rodrguez ("Agent
Rodrguez"), as a "confession."  Agent Rodrguez was the only
witness to testify at trial that Lozada incriminated himself.  He
was cross-examined by the defense.  Then, at a critical juncture in
the proceedings and on redirect, the prosecution offered a detailed
typewritten report ostensibly to repair Agent Rodrguez's
credibility.  This report paraphrased a series of damaging
statements allegedly made by Lozada, thereby buttressing the
agent's oral testimony.  Again over defendant's objections, the
court accepted this evidence.   
 Taking the stand in his own defense, Lozada testified
that he had met some of the principals in the alleged conspiracy
under completely innocent circumstances.  He also acknowledged that
he sometimes allowed Rosario, his long-time friend, to use his
warehouse for storage space, but denied actively participating in
a drug trafficking conspiracy.  He vehemently denied making any
incriminating statements to government agents after his arrest.  
His nephew took the stand and said that he had, on occasion,
prepared paperwork on Rosario's behalf using the shipping name
"Loza Foods."  Other witnesses attested to Lozada's reputation for
truth-telling.
 On September 22, 1997, after a few hours of deliberation,
the jury convicted Lozada on all counts.  The court subsequently
sentenced him to 210 months of imprisonment followed by five years
of supervised release, after departing downward from the applicable
sentencing guideline range based on his advanced age and
significant physical ailments.  Lozada filed a timely appeal.
                               II
 We lead off with the issue of whether the trial court
erred by accepting the DEA report into evidence.  During the
government's case-in-chief, Agent Rodrguez testified that Lozada
made certain incriminating comments during a post-arrest interview
on May 4, 1997.  According to Agent Rodrguez, Lozada admitted his
role in the conspiracy and explained his actions in furtherance of
its objectives.
 During cross-examination, defense counsel established
that the interview had not been tape-recorded or videotaped.  He
then asked Agent Rodrguez to confirm that he had once lived in
Lozada's neighborhood and attended school with his children, and
inquired whether he had anything against Lozada or his family.  
Agent Rodrguez answered in the negative, and counsel pressed no
further.
 On redirect, the government sought to introduce a formal
report prepared by Agent Rodrguez in which he recounted his
version of Lozada's alleged comments during the March 4, 1997
interview, to rebut what it believed to be a charge of improper
motive made during defense counsel's examination.  The DEA report
characterized the discussion as marked by defendant's willingness
to "talk about the events that led to his involvement in drug
trafficking activities," and ascribed to Lozada certain admissions
revealing his awareness of crucial details of the drug trafficking
ring, including the method of smuggling the cocaine and his
familiarity with key players in the scheme.  Agent Rodrguez
apparently completed the report a day or two after the actual
interview based on contemporaneous notes he had taken during the
conversation, which have since been destroyed.  The government
explicitly "offered [the report] under Fed. R. Evid. 801(d)" to
"rebut the attack on his credibility."
 Defense counsel objected, saying that the contents of the
report were overly prejudicial and constituted inadmissible
hearsay.  The district court overruled defendant's objections and
allowed the report into evidence, ruling that it was admissible to
rebut Lozada's implied charge of improper motivation because
counsel "went into the motive by saying he [the agent] was in the
same school, that he knew the family."  The court instructed the
jury that the report had been received solely for the purpose of
"weighing the credibility of [Agent Rodrguez]."
 At a subsequent point in the trial, after Lozada himself
took the stand and denied making incriminating remarks to Agent
Rodrguez, the government moved the court to accept another copy of
the report into evidence (the previous one apparently had a few
parts excised).  The trial court did so, calling the jury's
attention to the DEA report anew.  This time, the judge instructed
the jury that the report could be used to assess "the credibility
of this witness [Lozada]" in addition to "the credibility of the
agent testifying on that matter," and "to give the weight that [the
jurors] think it deserves, if any, to the testimonies."  (Emphasis
added).  Lozada renewed his previous objections, to no avail.
 On appeal, Lozada contends that the trial judge
misapplied Rule 801(d)(1)(B).  He argues that his cross-examination
did not open the door to introduction of the report.  Citing Tome
v. United States, 513 U.S. 150 (1995) (prior consistent statement
may not be admitted under Rule 801(d)(1)(B) unless it antedates
alleged motive), he further argues that even if his questioning
opened the door, the report could not be used to refute an implied
charge that Agent Rodrguez may have disliked Lozada or his family
because it was prepared well after the purported bias arose.  In
response, the government maintains that the court properly received
the report for credibility purposes, not for the truth of its
contents.  Citing a long line of cases spanning several circuits,
it says that the court's evidentiary ruling had firm support in the
doctrine of rehabilitation.  
 We scrutinize the trial court's evidentiary ruling for an
abuse of discretion.  See United States v. Reeder, 170 F.3d 93, 107
(1st Cir. 1999).  Our analysis is initially complicated by a
certain degree of ambiguity as to how the report was actually used
at trial.  Lozada directs our attention to certain points in the
record suggesting that the report, in fact, was considered for the
truth of the matter asserted.  Specifically, he insists that
counsel for the government improperly argued the contents of the
report to the jury in his rebuttal argument at the close of trial.  
We observe, in addition, that the trial judge seemed to tell the
jurors on at least one occasion that they could use the substance
of the report to evaluate defendant's credibility.   
 For its part, the government points out that,
notwithstanding its reference to Rule 801(d)(1)(B), the trial court
characterized its ruling as accepting the report only for
credibility; accordingly, it specifically instructed the jury
repeatedly not to consider the report for the truth of the matter.  
The government leans heavily on the doctrine of rehabilitation and
ignores Rule 801(d)(1)(B) almost entirely.
 This confusion is somewhat understandable due to the as
yet unresolved legal dilemma concerning the extent to which the
Rule altered preexisting common law standards governing
rehabilitative use of prior statements.  It is a matter of some
debate whether Rule 801(d)(1)(B) controls prior consistent
statements of all stripes or whether a more relaxed test applies
when a prior statement is offered for a rehabilitative purpose.  
Compare United States v. Miller, 874 F.2d 1255, 1273 n.12 (9th Cir.
1989) ("There is . . . no class of prior consistent statements,
offered for purposes of rehabilitation, that does not fall within
the literal scope of Rule 801(d)(1)(B).") with United States v.
Pierre, 781 F.2d 329, 333 (2d Cir. 1986) (irrespective of Rule
801(d)(1)(B), prior consistent statement offered to rehabilitate a
witness is subject only to condition that it "has a probative force
bearing on credibility beyond merely showing repetition.").  
 We need not settle on precisely how these elements (i.e.,
Rule 801(d)(1)(B), Tome, and the common law notion of
rehabilitation) fit together.  The uncertainty does not materially
alter the calculus in the case at bar because the trial judge erred
in his threshold determination that defense counsel's examination
of Agent Rodrguez opened the door to the report.  This
determination is a necessary precondition for admission of a prior
statement under the Rule or based on any other rehabilitative
ground, and the government failed to satisfy it.
 For the most part, defense counsel's cross-examination of
Agent Rodrguez was a routine affair, remarkable only for its
brevity and relative restraint.  The only arguable suggestion of
improper motive on the part of Agent Rodrguez came near the end of
a meandering line of questioning that ultimately bore no fruit:
counsel asked a series of questions probing whether Agent Rodrguez
might bear some ill will toward Lozada's family because he had once
lived in Lozada's neighborhood and attended school with his
children.  This was a weak innuendo at best, as any interaction
between Agent Rodrguez and Lozada's family occurred in the distant
past; he knew Lozada's children in the ninth grade, and he was 37
years old when he testified.  More important, Agent Rodrguez
denied ever having a problem with Lozada or any member of his
family, and Lozada did not test this denial with even a single
concrete example tending to show actual bias.  Discovering nothing,
he simply moved on.   
 We do not see how this attenuated suggestion of improper
motive paved the way to rebuttal by way of the official report.  
While we accord deference to a trial court's finding as to whether
counsel has implied during his questioning that a witness has a
motive to fabricate, see United States v. Piva, 870 F.2d 753, 758
(1st Cir. 1989), that deference is not absolute   there must be
record support for such a finding.  Generally speaking, a charge of
improper motive or recent fabrication need not be expressly made or
buttressed by concrete evidence.  But the proponent of evidence
must point to specific questions during his adversary's examination
that suggest recent fabrication or bias.  Merely appealing to
credibility as a live issue will not do the trick.  See Thomas v.
United States, 41 F.3d 1109, 1119 (7th Cir. 1994) ("One may impeach
for lack of credibility without going so far as to charge recent
fabrication.").   
 There are occasions when a theory of bias is so
implausible and the corresponding suggestion of contrivance so weak
that the line of questioning would not even qualify as an implicit
charge of improper motivation.  See Christmas v. Sanders, 759 F.2d
1284, 1288 (7th Cir. 1985) (theory was "too attenuated to support
any inference of an implied charge of recent fabrication"); see
also Casoni, 950 F.2d at 904 (while the bar is not high, the clear
implication must be that the witness "consciously altered his
testimony"); Breneman v. Kennecott Corp., 799 F.2d 470, 473 (9th
Cir. 1986) ("Mere contradictory testimony cannot give rise to an
implied charge of fabrication.").  So it is here.  Any suggestion
that prior contact with defendant's family rendered Agent Rodrguez
biased was strained at best, and certainly should not have been
dispelled by admitting an official document containing highly
prejudicial information.  
 From our review of the record, it is also apparent that
the trial court deemed the report relevant to aid the jury's
assessment of Agent Rodrguez's credibility and later broadened its
use to include evaluation of Lozada's credibility as well.  It is
difficult to escape the conclusion that the DEA report was thrown
into the mix to assess the crucial witnesses's credibility
generally, without either explicit or meaningful limitation.  This
was improper.
 We wish to stress that the report should not have been
used to assess the credibility of Lozada, which the judge
encouraged the jury to do upon the conclusion of the government's
examination.  We see absolutely no reason for such a use of the
report   indeed, it may have been tantamount to an invitation to
use the report as substantive evidence.  How else could the report
bear on Lozada's credibility (he did not author the report) unless
a factfinder compared the details of the report with Lozada's in-
court testimony in a way that accepted both for the truth?  
 Having concluded that the report was erroneously admitted
into evidence, we must next decide whether the mistake requires
reversal of defendant's conviction.  In order to deem the defect
non-reversible, we would have to say "with fair assurance . . .
that the judgment was not substantially swayed by the error."  
United States v. Gaines, 170 F.3d 72, 82 (1st Cir. 1999) (quoting
Vincent v. Louis Marx & Co., 874 F.2d 36, 41 (1st Cir. 1989)); see
also Fed. R. Crim. P. 52(a).   
 The government bears the burden of demonstrating that the
outcome would likely have been the same but for the miscue.  Here,
it has expressly conceded that if the district court erred by
receiving the report, the mistake was sufficiently prejudicial as
to warrant a new trial.  The government did not argue in its brief
that this kind of error could have been harmless under the present
fact-scenario.  When queried at oral argument, it acknowledged that
defendant would be entitled to a new trial if we concluded that the
report was erroneously received into the record.  We wholeheartedly
concur, and commend the government for its forthrightness.
  We add only this thought:  Although the DEA report
largely tracked Agent Rodrguez's own in-court testimony, it
essentially provided the jury with an authoritative "condensation
of the government's whole case against the defendant."  Quinto, 582
F.2d at 236.  That this official report contained damning
admissions attributed to Lozada and that it followed the jurors
into the jury room are enough to establish that defendant was
adversely affected.  See, e.g., United States v. Pendas-Martnez,
845 F.2d 938, 941 (11th Cir. 1988) (erroneously admitted Coast
Guard report summarized essential facts of government's case);
United States v. Brown, 451 F.2d 1231, 1234 (5th Cir. 1971)
(prejudice entailed where detailed report and handwritten notes
constituted brief recap of crucial aspects of government's case and
"accompanied the jury into the jury room").  
 Because the trial court erroneously permitted the
government to use the DEA report in its redirect inquiry and
admitted that report into evidence, thereby allowing the jurors to
evaluate the substance of the report and give it effect in
determining the defendant's credibility, we cannot fairly
characterize the mistake as a harmless one.  Lozada is entitled to
a new trial.
                              III
 We also hold that the district court committed reversible
error which deprived Lozada of his Sixth Amendment right to
counsel.  Over defense counsel's objections, the trial judge
allowed Torres, a cooperating witness, to testify as to a jailhouse
conversation he had with Lozada the night before he was scheduled
to take the stand.  Among other things, Torres claimed that Lozada
offered him a financial inducement to alter his testimony at
trial.   
 During a heated exchange at sidebar, defense counsel
pointed out that Lozada was represented by counsel at the time of
the conversation, contended that admission of his alleged jailhouse
comments would be extremely prejudicial, and claimed that he had
been sandbagged by this new evidence.  He later renewed his
objection and asked that Torres's testimony be stricken from the
record, arguing in greater detail that these statements had been
extracted contrary to Lozada's Sixth Amendment right to counsel.  
After asking the government a single question   whether counsel was
aware of any "contacts [its agents] were trying to make between
defendant and any other witness in this case" and receiving an
answer in the negative   the court denied the motion.
 Under the rule of Massiah v. United States, 377 U.S. 201
(1964), the government may not use a defendant's words against him
at trial if those words "were deliberately elicited from him after
he had been indicted and in the absence of his counsel."  Id. at
206.  From that critical moment onward, the Sixth Amendment imposes
on government agents "an affirmative obligation to respect and
preserve the accused's choice to seek th[e] assistance" of counsel.  
United States v. Moulton, 474 U.S. 159, 171 (1985).  The
controlling test is whether the government agent "intentionally
creat[ed] a situation likely to induce [a defendant] to make
incriminating statements without the assistance of counsel."  
United States v. Henry, 447 U.S. 264, 274 (1980).  That the
government does not explicitly instruct a cooperating witness to
procure incriminating statements does not always defeat a Massiah
claim, for conduct by an individual may in certain circumstances be
imputed to the government even where it has not affirmatively
directed the person to interrogate the defendant.  See id.
(defendant's alleged statements wrongly admitted even though
informant was specifically instructed not to initiate conversation
but was simply told to "be alert to any statements" made by
defendant); Hancock v. White, 378 F.2d 479 (1st Cir. 1967) (holding
that Massiah can be violated even though statements were procured
without any trickery or subterfuge).
 There is no question that Lozada's right to counsel had
attached by the time of his jailhouse conversation with Torres.  In
the typical case, the central controversy is over whether certain
statements were deliberately elicited or whether they were
spontaneously volunteered, always a fact-intensive inquiry.  Where
the witness acts only as a "passive listening post," permitting a
jury to consider the overheard statements might not trample a
defendant's right to counsel.  See Kuhlmann v. Wilson, 477 U.S.
436, 459 (1986) ("[T]he Sixth Amendment is not violated whenever   
by luck or happenstance   the State obtains incriminating
statements from the accused after the right to counsel has
attached") (quoting Moulton, 474 U.S. at 176); Henry, 447 U.S. at
276 ("Massiah does not prohibit the introduction of spontaneous
statements that are not elicited by governmental action") (Powell,
J., concurring).  The underlying rationale is that in such a
scenario a defendant should not be rewarded   and the government
penalized   for spilling the beans.  We bypass this usual analysis
here.  
 In this instance, the government has expressly conceded
on appeal that Torres "deliberately elicited" the incriminating
jailhouse statements from Lozada and that Torres was a government
agent for purposes of our Massiah analysis.  It argues only that
the error was harmless given the weight of the evidence against
him.
 We strongly disagree that admission of these statements
was harmless.  Constitutional error of this nature is harmless only
if it can be said "beyond a reasonable doubt that the error
complained of did not contribute to the verdict obtained."  Chapman
v. California, 386 U.S. 18, 24 (1967); see Milton v. Wainwright,
407 U.S. 371, 377-78 (1972) (applying reasonable doubt standard to
assess effect of Massiah violation).  This attempt to ascertain the
probable impact of the error requires us to weigh the quantum of
the government's evidence of guilt against the inherent gravity of
the miscue.
 The government tendered substantial evidence pointing
toward Lozada's guilt.  Several witnesses testified that he played
a prominent role in the transportation unit, and this testimony and
documentary evidence also revealed seemingly suspicious
circumstances casting a pall on his protestations of innocence.  
The prosecution's case was not, however, so one-sided that we can
fairly say that the damaging testimony provided by had little or no
effect on the jury's decision.  In addition, the harmless error
test is more stringent where an error of constitutional dimension
has infected the trial.  The government cannot surmount this
obstacle.  
 The government urges us to conclude that the
constitutional error likely had a de minimis effect because Lozada
supposedly asked Torres to shade his testimony only as to one
particular transaction, the implication being that evidence that
defendant selectively tampered with a witness did not necessarily
taint the entire proceedings.   
 This argument grossly underestimates the impact of the
jailhouse statements attributed to Lozada.  In all likelihood, the
mere suggestion that Lozada asked   or even worse, that he tried
to bribe   a material witness (and alleged co-conspirator) to alter
his testimony the night before he was to testify destroyed Lozada's
credibility, for a jury would reasonably presume that an innocent
man would have no reason to ask a witness to shade his testimony.  
Put another way, this bit of evidence strongly tended to show that
a guilty mind was at work.  Once heard, it could well have become
the colored lens through which the jury viewed all of the other
evidence.  
 Reversed and remanded for a new trial.  So ordered.

</body>

</html>