UNITED STATES of America,
Plaintiff,

v.

Frank FERNANDEZ, aka "Sapo"; Juan Garcia, aka "Topo"; Mariano Martinez, aka "Chuy"; Jimmy Sanchez, aka "Smokey"; Crispin Alvidrez, aka "Conejo"; Fernando Alvidrez, aka "Cuate"; Javier Alvidrez Duarte; Marcel Arevalo, aka "Psycho"; Daniel Bravo, aka "Sporty"; Mario Castillo, aka "Whisper"; Robert Cervantes, aka "Gypsy"; Roy Galvadon, aka "Spider"; Dominick Gonzales, aka "Solo"; David Gonzales–Contreras, aka "David Contreras–Gonzales"; Gerardo Jacobo, aka "Blanco"; Robert Mercado, Jr., aka "Gato"; Ernesto Murillo, aka "Solo"; Adrian Nieto; Rolando Ontiveros, aka "Rolo"; Sally Peters; Jesus Ramirez, aka "Juan Carlos Alvarez," aka "Dreamer"; Roland Ramirez, aka "Capone"; Jesus Rochin, aka "Gizmo"; Suzanne Schoenberg, Defendants.

No. CR99–83(A) DOC.

United States District Court,
C.D. California.

July 18, 2001.

---

Manuel U. Araujo, Beverly Hills, CA, Christopher Dombrowski, Sherman, TX, for Frank Fernandez.

Paul E. Potter, Pasadena, CA, Irene Ayala, Los Angeles, CA, for Juan Perez Garcia.

Ellen M. Barry, Los Angeles, CA, Mark Overland, Santa Monica, CA, for Mariano D. Martinez.

Charles Pereyra-Suarez, Los Angeles, CA, for Jimmy Sanchez.

Barry Levin, Los Angeles, CA, Brian A. Newman, Culver City, CA, for Max Torvisco.

Sonia E. Chahin, La Canada, CA, Paul C. Horgan, Los Angeles, CA, Michael Belter, Riverside, CA, for Marcel Arevalo.

Elliot R. Stanford, Pacific Palisades, CA, John Cotsirilos, San Diego, CA, for Daniel Bravo.

Richard M. Callahan, Jr., Pasadena, CA, Kenneth A. Reed, Santa Ana, CA, for Robert Cervantes.

John Y. Zurdiaga, Los Angeles, Thomas Nishi, Los Angeles, CA, for Roy Gavaldon.

Philip Deitch, Los Angeles, CA, for David Gonzalez-Contreras. ·

Terry J. Amdur, Pasadena, CA, Jack M. Erley, Irvine, CA, for Robert Mercado, Jr.

Edward M. Robinson, Torrance, CA, for Ernesto Murillo.

Thomas H. Wolfson, Orange, CA, Charles Pereyra-Suarez, Los Angeles, CA, for Juan Alfredo Ramirez.

Michael J. Treman, Santa Barbara, CA, Michael J. Brennan, Manhatten Beach, CA, for Roland Ramirez.

Karen L. Woods, Beverly Hills, CA, Ken K. Behzadi, Los Angeles, CA, Paul Horgan, Los Angeles, CA, for Jesus Rochin.

Stephen E. Webber, Los Angeles, CA, Michael Abzug, Los Angeles, CA, Thomas Wolfson, Orange, CA, Phillip A. Trevino, Beverly Hills, CA, Darryl L. Exum, Riverside, CA, Charles Pereya-Suarez, Los Angeles, CA, for Crispin Alvidrez.

Anthony P. Brooklier, Los Angeles, CA, Anthony Robusto, Glendora, CA,for Fernando Alvidrez.

Yolanda Barrera, Arcadia, CA, Alan Eisner, Los Angeles, Morton Borenstein, Encino, CA, for Javier Alvidrez Duarte.

Elliot R. Stanford, Pacific Palisades, Michael Crain, Santa Monica, CA, William Healy, Torrance, CA, for Mario Castillo.

Gary M. Pohlson, Laguna Hills, CA, Lynne Patterson, Huntington Beach, CA, for Dominick Shewmaker Gonzales.

Kimberly A. Urie, Venica, CA, Larry Bakman, Los Angeles, CA, Dale Michael Rubin, San Martino, CA, for Gerardo Jacobo.

Morton H. Boren, Los Angeles, CA, for Adrian Nieto.

W. Michael Mayock, Pasadena, CA, for Rolando Ontiveros.

George W. Buehler, Los Angeles, CA, for Sally Peters.

David R. Evans, Pasadena, CA, for Suzanne Schoenberg.

Dan Levin, Lizabeth A. Rhodes, Jack P. Dicanio, Los Angeles, CA, for U.S.

## ORDER ON MOTIONS REGARDING ADMISSIBILITY OF ROCHIN'S TESTIMONY

CARTER, District Judge.

The government intends for Jesus Rochin, a defendant in this case who has entered into a plea agreement and is cooperating with the government, to testify for the government. The government seeks to introduce Rochin's testimony regarding statements allegedly made by Jacobo about the Montebello murders and a "snitch" letter he saw that Jacobo received from Martinez in January 2000. The government also seeks to introduce a birthday card signed by several defendants and sent to Rochin in December 1999. In addition, the government intends for Rochin to testify regarding statements made to him by Mariano Martinez, another co-defendant in this case, soon after the Montebello murders. The statements sought to be introduced implicate defendants Jacobo, Arevalo, Castillo and Mercado in the murders.

Defendants challenge the admissibility of the statements on the grounds that they are inadmissible hearsay that do not fall into any exception. Jacobo also argues that they are not admissible because Rochin is a government informant and therefore Jacobo's Sixth Amendment right to counsel is violated under the *Massiah* line of cases. The government argues that under a recent Ninth Circuit case, the statements are admissible against all defendants as statements against penal interest made with particularized guarantees of trustworthiness. If the statements are not admissible as statements against penal interest made with particularized guarantees of trustworthiness, then the government argues that they are admissible against Jacobo as statements of a party opponent and that references to co-defendants can be redacted.

## I.

## RIGHT TO COUNSEL (MASSIAH ANALYSIS)

Jacobo raises an objection to Rochin's testimony about his statements being admitted against him. He argues that because Rochin is a "snitch," or cooperating with the government, Rochin was a government agent at the time Jacobo talked with him in their shared cell and thus admitting the statements against Jacobo is unconstitutional because it violates his Sixth Amendment right to an attorney.

In *Massiah v. United States,* 377 U.S. 201, 202, 84 S.Ct. 1199, 1201, 12 L.Ed.2d 246 (1964), Massiah had been indicted and released on bail. Prior to his release, he had retained an attorney and pled not guilty. While out, he had a long conversation with a co-conspirator in one of their cars. During the course of this conversation he made incriminating statements. Unbeknownst to Massiah, the co-conspirator had begun cooperating with the government and had installed a radio transmitter under the seat of the car. The radio transmitter allowed a law enforcement officer to listen to the statements as they were being made. The officer then testified at Massiah's trial and relayed the incriminating statements he had heard Massiah make.

■ The Supreme Court held that admission of the officer's testimony violated Massiah's Fifth and Sixth Amendment rights. *Id.* at 204–07, 84 S.Ct. at 1202–03. The Court held that the ban on interrogations without counsel after an indictment has been returned applies whenever the government seeks to use "against [a defendant] at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. at 1203. The ban applies equally to "indirect and surreptitious interrogations." *Id.*

■ Later cases have fleshed out the contours of this rule. Statements made by a defendant to a government informant are not admissible against the defendant when the government "deliberately elicits" testimony through the informant or "knowingly exploits" an opportunity when the defendant is likely to speak to the informant without counsel. *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 270–74, 100 S.Ct. 2183, 2186–89, 65 L.Ed.2d 115 (1980). Further, "a defendant does not make out a violation of [the *Massiah* rule] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986).

Here, the information presented to the Court indicates that Rochin struck a deal with the government sometime between November 1999 and February 2000.[1] The significant date is the date the agreement was made, not the date on which it was reduced to writing.

■ While *Massiah* and its progeny do not ban the use of any and all statements overheard by informants, the Court is satisfied that any statements made to Rochin by Jacobo, after Rochin began cooperating, that incriminate Jacobo are not admissible against Jacobo. There is no evidence before the Court that the government purposely placed the two together in a cell for the purpose of gaining information from Jacobo. However, Rochin did not testify as to specifically which of them initiated the December conversation. He did testify that the conversation was about Jacobo's concern, based on some evidence seen in the discovery room, that there may have been a videotape made at the convenience store at which they stopped before the murders. Thus, it is possible that Jacobo initiated the conversation. However, Rochin had also been to the discovery room and had seen the evidence. He testified that he was the one who initiated the July conversation, by talking about the attempted murder of Stranger on Easter Sunday. Thus, it is at least equally possible, and the Court finds that it is more likely than not, that Rochin initiated the December conversation. It violates the *Massiah* rule for the government to profit from a situation in which an informant initiates a conversation and thereby elicits incriminating statements from a defendant. Thus, the birthday card, which was sent in December 1999 and includes a message from Jacobo asking Rochin to keep his promise so that he can be with his family soon, is not admissible and testimony about the second conversation between Rochin and Jacobo, about the convenience store and the videotape, is not admissible against Jacobo.[2]

---

1. Rochin testified to these dates out of the presence of the jury. His attorney at the time in question, Karen Woods, is now deceased and cannot be examined. Further, while evidence indicates that Rochin may have been thinking about cooperating earlier, it seems unlikely that any deal was struck, because Rochin was not moved until January or February 2000.

2. The birthday card is inadmissible against all defendants for an additional reason. Rochin testified that he turned it over to law enforcement in January 2000. It was never turned over to the defense during pretrial discovery. Apparently, the government has only recently taken note of the card and its possible relevance. The government produced it to the defense just last week, close to the end of the government's case. This is too late for the

■ This ruling does not bar admission of Rochin's testimony about the snitch letter, however. The *Massiah* rule addresses the declarant's right to counsel. The declarant of the letter, Martinez, is not on trial here and thus his right to counsel is not relevant. Further, the statements in the letter were made to Jacobo, not to Rochin. If the statements were not made to the government informant, *Massiah* is not implicated. Thus, while Rochin cannot testify as to things Jacobo told him after November 1999, he may testify as to what he observed about the letter, from his personal knowledge.

■ Further, statements made by Jacobo to Rochin in July 1999 are not barred by *Massiah* and its progeny. The *Massiah* rule applies only when the informant has actually become a government agent. *Brooks v. Kincheloe,* 848 F.2d 940, 945 (9th Cir.1988); *see also United States v. Birbal,* 113 F.3d 342, 346 (2d Cir.1997) (citing cases and noting that "circuits agree that an informant becomes a government agent ... only when the informant has been instructed by the police to get information about the particular defendant"); 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.4(g) & n. 137 (1999). Even if the informant, in this case Rochin, was thinking about and contemplating cooperation, and even if he knew that those who cooperate usually get a better deal themselves, if he was not yet acting on instructions from the government, *Massiah* is not implicated. *Massiah* and its progeny are concerned with the relationship between the government and the declarant, through the intermediary of the informant, and if the informant is not yet working for the government, that relationship is not implicated. The statements made by Jacobo to Rochin in July 1999 are admissible against Jacobo as admissions of a party opponent. Fed.R.Evid. 801(d)(2)(A).

defense to have an adequate opportunity to

## II.

### RIGHT TO CONFRONTATION (BOONE ANALYSIS)

All defendants raise hearsay and Confrontation Clause objections to Rochin's proposed testimony.

### A. Admissibility of Jacobo's July and December 1999 Statements to Rochin

As discussed above, Jacobo's December 1999 statements to Rochin are not admissible against Jacobo under *Massiah* but his July 1999 statements are admissible against him. As the *Massiah* issues concern only Jacobo, whether or not either the July or December 1999 statements are admissible against the other defendants mentioned in them is a different question.

### 1. Particularized Guarantees of Trustworthiness

■ The co-defendants who are implicated in Jacobo's statements to Rochin argue that his statements are not admissible against them. At issue here is whether admission of Jacobo's statements would violate his co-defendants' rights under the Confrontation Clause of the Sixth Amendment. The amendment states that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." "The Confrontation Clause forbids the use of hearsay against a criminal defendant at trial unless the evidence 'falls within a firmly rooted hearsay exception' or otherwise contains 'particularized guarantees of trustworthiness.'" *United States v. Boone,* 229 F.3d 1231, 1233 (9th Cir.2000) (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)).

prepare regarding this evidence.

■ In a recent case, the Supreme Court held that a non-testifying accomplice's confession to law enforcement officers violated the defendant's right to confrontation even though the confession implicated the accomplice because it did not contain guarantees of trustworthiness. *Lilly v. Virginia*, 527 U.S. 116, 139, 119 S.Ct. 1887, 1901, 144 L.Ed.2d 117 (1999).[3] The Supreme Court has not specifically addressed situations in which the confession is made to a co-conspirator or accomplice rather than law enforcement.

### a. Reliability of Jacobo's Statements to Rochin

The Ninth Circuit recently addressed whether an accomplice's statements to someone who is not in law enforcement are admissible under *Lilly*. In *Boone*, the Ninth Circuit held that an accomplice's statements to his girlfriend that implicated both the accomplice and the defendant were admissible against the defendant because the statements contained "particularized guarantees of trustworthiness." 229 F.3d at 1234. The accomplice-declarant and the defendant had participated in the robbery of a rug store. *Id.* at 1232. The court distinguished the situation from *Lilly* because the accomplice was not talking to law enforcement and because he did not try to shift blame. *Id.* at 1234. The accomplice was talking to his girlfriend, not law enforcement. *Id.* at 1232. The fact that the girlfriend was taping the conversation for law enforcement was unknown to the accomplice. *Id.* Therefore, at that time, he had no reason to lie. *Id.*

at 1234. In addition, the accomplice did not in fact shift blame. *Id.* He inculpated himself as well as the defendant, unlike in *Lilly*. *Id.* The Ninth Circuit considers these two factors, communication with non-law enforcement, and no shifting of blame, as indicia of reliability post-*Lilly*. As further indicators of reliability, the *Boone* court also considered whether the declarant's statement itself was reliable. The accomplice-declarant's statement included details that would not be likely to have been fabricated. For example, the declarant mentioned that President Bush was nearby playing golf, thus making the robbery more difficult. He also mentioned that the defendant had shooed away a customer during the robbery. *Id.* at 1232.

■ The government here argues that Jacobo's statements are admissible pursuant to *Boone* because they were not made to law enforcement and because the statements squarely implicate Jacobo and do not shift blame. However, the analysis is not as simple as that. The Confrontation Clause is a constitutional right which cannot be trumped by a simplistic and mechanical hearsay rule application. Rather, the factors set forth in *Boone* reflect a fact-intensive analysis to determine whether the declarant's statement is reliable, even if not made to law enforcement and not self-exculpatory.

In some ways this case is like *Boone*. Because Jacobo had already been arrested, he would have reason to be quite wary of discussing any matters which were at issue in his case. Rochin was a fellow member of a gang whose cardinal rule was that its members and associates do not cooperate

---

**3.** The Court should examine the circumstances in which the statement was made; *not* whether other evidence corroborates the substance of the statement. *See Lilly v. Virginia*, 527 U.S. 116, 137–38, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999) ("[T]hat other evidence at trial corroborated portions of [the declarant's] statement is irrelevant. We have squarely rejected the notion that 'evidence corroborating the truth' of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness.'") (quoting *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990)).

with law enforcement and therefore Jacobo would have felt that Rochin was trustworthy. Also, Jacobo would have little reason to lie to him, particularly as he implicated himself as well as others. His statements to Rochin include his own participation in the murders, particularly odd if he knew that Rochin was a snitch. He admits to being told to commit the murders, he admits to walking into the garage, and he admits to "shooting at everyone." He makes no effort to either exculpate himself or to shift blame to Castillo or the others; rather, he simply describes Castillo's role in exactly the same terms as his own. His statements also include details, such as the use of walkie talkies, that his gun jammed, and concerns about being on the videotape at a convenience store, that are internal indicia of reliability like the comments about President Bush playing golf and the defendant's comments to a customer in *Boone*.

However, there are other compelling facts that distinguish this case from *Boone*. If Jacobo was aware that Rochin might be a "snitch," he would have had no reason to tell Rochin the truth about anything that might be related back to law enforcement. Letters from cooperating witness Max Torvisco to his girlfriend, Angela, in February 1999 strongly suggest that Rochin was considering cooperation, and discussing it with other members of La EME, as early as February 1999. Thus, even before the July 1999 statements, Jacobo may have had reason to think Rochin was going to snitch. The government argues that the birthday card shows that Jacobo struck a "deal" with Rochin whereby Rochin would not tell law enforcement about Jacobo's own involvement, but would report his comments about the co-defendants. In such a situation, Jacobo would have had an incentive to embellish or fabricate the details he conveyed about the co-defendants even if he was being truthful about himself. In addition, as a young associate in La EME,[4] Jacobo might in fact have an incentive to lie to Rochin, who was higher up in La EME,[5] by embellishing or fabricating stories of violence, as that would improve his standing with La EME.

Finally, and most significantly, while Rochin may have been a member of the same gang as Jacobo, there is no indication that the relation between Rochin and Jacobo was akin to a boyfriend/girlfriend as in *Boone*. Rochin testified *in camera* that he and Jacobo did not know each other at all, and had never met, prior to being celled together at MDC. The Court has heard approximately 40 taped conversations involving Rochin, in which he discusses other defendants fully and openly, but he never mentions Jacobo. This is further evidence that the two had no relationship prior to being celled together. Thus, unlike in *Boone*, Jacobo was not talking to someone with whom he had any kind of close relationship.

On balance, and considering especially that Jacobo and Rochin did not have a relationship prior to being celled together and that Jacobo may have had reason to think Rochin was a snitch, the statements do not seem to be sufficiently reliable to be admitted under *Boone*. *See United States v. McCleskey*, 228 F.3d 640, 644 (6th Cir. 2000) (self-inculpating statement that also shifts blame and is offered by government "is garden variety hearsay and it does not lose that character merely because it in addition reliably inculpates the declarant.").[6]

---

**4.** It is also possible that Jacobo was not even an associate.

**5.** Tape evidence contains some talk of Rochin being made a member.

**6.** In addition, while this is not a factor discussed by the Ninth Circuit, the Court notes that in both *Boone* and *Lilly,* the fact that the hearsay statements were made was not in

### b. Rochin's Credibility

The government and defendants dispute whether the Court, when determining whether there are particularized guarantees of trustworthiness such that a hearsay statement made against penal interest is reliable enough to be admitted against someone other than the declarant, should also consider the reliability and credibility of the person conveying the statement, the relator. Defendants make this argument because they argue that it is significant that in *Boone*, the statements were tape recorded, thus leaving no doubt that the statements were in fact made. The only issue in *Boone* was whether the statements were true when made. In the present case, there is the additional issue of whether the statements were ever made in the first place. That is, there is the question of the reliability of the relator. This issue was not addressed in *Boone*.

In similar settings, some courts consider only the circumstances surrounding the initial statement from the declarant to the relator. *See United States v. Shukri*, 207 F.3d 412, 417–18 (7th Cir.2000); *United States v. Katsougrakis*, 715 F.2d 769, 777 (2d Cir.1983); *United States v. Atkins*, 558 F.2d 133, 135–36 (3d Cir.1977). The rationale behind these courts' approach is that the court must perform some analysis of the reliability of the declarant because the jury has no opportunity to evaluate the sincerity, accuracy, memory, and truthfulness of the out-of-court declarant, but the jury can evaluate those aspects of the relator's testimony.

At least one circuit, however, allows the trial court to evaluate both the reliability of the declarant's statement and the reliability of the relator's testimony about that statement. *See United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir.1978); *United States v. Bagley*, 537 F.2d 162, 167–68 (5th

Cir.1976). Under this approach, before admitting such a statement, the Court would need to be satisfied both that circumstances indicate that the declarant had no reason to lie and also that the relator is now accurately relating what was said to him or her.

The Ninth Circuit has not adopted one approach or the other. In a 1978 decision, the majority opinion discussed the rationales behind both approaches, but held that no choice had to be made on the facts of the case before it. *United States v. Satterfield*, 572 F.2d 687, 691–92 (9th Cir. 1978). One judge concurred in the result but stated that he thought a decision should be made and further that the trial judge should be allowed, within certain parameters, to evaluate the trustworthiness of the relator. *Id.* at 694 (Sneed, J., concurring in the result). The issue did not need to be addressed in *Boone* because the statements had been tape recorded.

■ Given that the Ninth Circuit has not ruled on this issue, the Court holds that the better approach is that taken by the Fifth Circuit, under which the trial court may evaluate the credibility of the relator. When the relator of a hearsay statement is also charged with crimes and is a cooperating witness for the government, the relator has a significant motive to name others as being involved, as doing so inures to the relator's own benefit when he is sentenced. Further, while the jury will be the final arbiter of whether the relator is telling the truth, given that the particularized guarantees of trustworthiness analysis is in effect an exception to what would otherwise be the result under the Confrontation Clause, it should be narrowly construed to protect the accused's constitutional rights. *See generally United States v. Paguio*, 114 F.3d 928, 934 (9th

doubt, as both were recorded. Such is not the case here.

Cir.1997) (stating that "[w]ere it not for the fence around the Confrontation Clause provided by the hearsay rule, prosecution use [of a hearsay statement] would implicate the accused's right to be 'confronted with the witnesses against him'" and noting that the concerns implicated by the admission of a hearsay statement vary depending on whether it is offered by the government or the defense because of defendants' constitutional rights). In addition, nothing in *Lilly* prevents courts from considering the credibility of the relator.[7] Accordingly, the Court holds that in ruling on the admissibility of Rochin's testimony regarding statements made to him, the Court may consider whether Rochin's testimony appears to meet a minimum level of credibility and could exclude the testimony if it appears that the statements were not, in fact, ever made to Rochin in the first place.

 The Court has observed Rochin testify in two prior trials in addition to this one and also questioned him during a hearing outside the presence of the jury about the issues addressed in this order. One fact that counts against Rochin's credibility somewhat is that in his initial 302, he said that Martinez had told him that "we did some murders" but in the last trial, he testified that Martinez had told him "we did some murders in Montebello." In addition, Rochin had access to the government's discovery at MDC and thus saw other evidence and reports before offering his own. Further, his desire to become a government informant, starting in February 1999, makes his credibility somewhat questionable. On the other hand, his testimony has been fairly consistent and he

appears to the Court to be, on the whole, credible.

In sum, while Rochin is more credible than not, the Court concludes that Jacobo's statements to Rochin do not contain particularized guarantees of trustworthiness. Rather, they are "garden variety hearsay" whose character is not changed simply because they were not made to law enforcement and because they are inculpating of Jacobo in addition to others. While those facts make the statement less unreliable than if Jacobo had been talking to law enforcement, when considered with all the facts and circumstances those facts alone are not enough to convince the Court that Jacobo's statements about the other defendants are sufficiently reliable. Rochin's credibility would probably be acceptable enough if there were other guarantees of Jacobo's reliability. However, given that the Court has identified several reasons why Jacobo might not have been telling Rochin the truth, the reasons why Rochin also might not be testifying truthfully are further reasons why Jacobo's statements to Rochin about other defendants are not admissible.

 In a situation such as this one, when the various relevant factors are nearly in equipoise, the Court is guided by constitutional concerns and should construe the rules narrowly to prevent a violation of the Confrontation Clause. This is especially so in a death penalty case, when the Eighth Amendment requires a heightened standard of reliability. Therefore, the Court holds that Jacobo's statements to Rochin are not admissible against the other defendants.

---

7. Justice Stevens's plurality opinion in *Dutton* holds that the credibility and reliability of the relator is not relevant to a Confrontation Clause analysis. *See Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). However, this opinion was joined by only three other justices and thus does not represent the holding of a majority of the Supreme Court.

## 2. Redaction

 Having found that Jacobo's statements are *not* statements against penal interest made with particularized guarantees of trustworthiness, and they therefore are not admissible against Castillo, Arevalo and Mercado, the December 1999 conversation is not admissible at all. The July 1999 conversation is admissible against Jacobo, but it must at a minimum be redacted to delete references to the other defendants under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The government suggests replacing "Castillo" with "the second shooter." Castillo suggests eliminating all references to any defendants other than Jacobo.

Under *Gray v. Maryland*, 523 U.S. 185, 192–94, 118 S.Ct. 1151, 1155–56, 140 L.Ed.2d 294 (1998), the Supreme Court ruled that a written confession implicating both the defendant and a co-defendant could not be redacted by simply replacing the co-defendant's name with "blank" or "deleted" in such a way that it was patently obvious to whom the reference was made. *Gray* differentiates between facially incriminating statements protected under *Bruton* and permissible statements which are only "inferentially" incriminating. *Id.* at 191, 118 S.Ct. at 1154; *see also Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987). The Court stated that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration ... leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that ... the law must require the same result [as *Bruton*]." *Gray*, 523

U.S. at 192, 118 S.Ct. at 1155. The Court noted the difference between an impermissible redaction that reads "me, deleted and a few other guys" and a potentially admissible redaction which reads "me and a few other guys." *Id.* at 194–95, 118 S.Ct. at 1156.[8]

Following *Gray*, the Ninth Circuit, in *United States v. Peterson*, 140 F.3d 819 (9th Cir.1998), held that redacting a written confession so that the named defendant was replaced with "Person X" is also not permissible when the resulting statement still obviously identifies the co-defendant. "Gray clarifies that the substitution of a neutral pronoun or symbol in place of the defendant's name is not permissible if it is obvious that an alteration has occurred to protect the identity of a specific person." *Id.* at 822; *see also United States v. Hoover*, 246 F.3d 1054, 1058–59 (7th Cir.2001) (replacing named defendant with "incarcerated leader" impermissible). Therefore, the government's proposed redaction substituting "the second shooter" for Castillo does not satisfy the requirements of *Bruton* or *Gray*.

In this case, the statements could be redacted to include only neutral references, such as "me and several other people drove to Montebello," or "we went into the shop, me through the back, and started shooting." However, an additional problem is present here. Nearly all reported cases seem to involve written statements or transcripts of tape recordings. *E.g., McGhee v. Yukins*, 229 F.3d 506 (6th Cir. 2000). In the very few cases involving a relator's testimony of an oral statement, it is only one or two statements that are the subject of the testimony. For example, in *United States v. Logan*, 210 F.3d 820, 823

---

**8.** Another problem in the underlying trial in *Gray* was that the prosecutor, immediately upon the reading of the redacted confession, asked the police officer whether the police were able to immediately arrest the co-defendant upon hearing the confession, thus removing all doubt to whom the "deleted" referred.

(8th Cir.2000), a police officer testified to a statement made by a defendant but which was not recorded or written down. The officer replaced the name of the co-defendant with the phrase "another individual." However, there was only one statement that was recalled, not a series of conversations.

Here, Rochin is expected to testify to an apparently lengthy conversation, strewn with references to other co-defendants. It is not clear whether Rochin would be able to testify accurately under both direct and cross without improper references. In order to ensure that Rochin is able to testify without inappropriate references, the Court intends to ask the prosecution exactly what Rochin will be asked and his expected replies. The Court might also conduct a hearing where the prosecution asks Rochin the questions to make sure Rochin is able to answer both accurately and with the correct redactions.

Based on case law, Rochin should testify along the following lines:

> *Jacobo told me that several people drove to the murder scene in a van. Another person was at the scene acting as a lookout. Prior to the murders, Jacobo had been told by Mariano Martinez to leave no witnesses.*
>
> *After being dropped off at the scene, they went into the shop. There, they began shooting, including Jacobo. Jacobo also told me that at some point, his gun jammed. He said that they were picked up afterward by the same person who drove them there.*
>
> *Jacobo also told me that the murder weapons were given to someone in Pico Rivera who was a friend of one of the people involved in the murder. The weapons were two .380s.*

This is only a guideline, however, not a script as Rochin will testify from his own recollection rather than from a written statement. The Court cautions all counsel to refrain from questioning that might elicit specific references to defendants other than Jacobo.[9]

### B. Admissibility of Martinez's Statements About the Murder Being "in Montebello"

In his initial statement to the FBI, Rochin stated that Martinez came to him a short time after the Montebello murders and said "we did some murders." Then, on the stand in Martinez's trial, Rochin testified that Martinez had told him "we did some murders in Montebello."

■ Defendants object to Rochin testifying in this way on the grounds that it violates the Confrontation Clause. However, defendants' issue is with Rochin, not Martinez. If Rochin is changing his story by adding details that were not included in Martinez's original statement, this can be exposed through cross-examination at trial. The statement was made soon after the murders, prior to arrests, and thus is admissible as a co-conspirator statement, which is a "firmly rooted" exception to the hearsay rule under *Lilly. Dutton v. Evans*, 400 U.S. 74, 81, 91 S.Ct. 210, 215–16, 27 L.Ed.2d 213 (1970). Further, even if analyzed under the "particularized guarantees" approach under *Boone*, Martinez and Rochin were both members of La EME and in fact Martinez was "higher" ranked than Rochin, meaning he had no reason to lie to him. Defendants are free to impeach Rochin with his prior statement and also to argue that the "we" referred to by Martinez does not include any of them.

---

**9.** In addition, the government should not specifically argue to the jury that the other people referred to by Jacobo were his co-defendants.

The testimony is admissible against all defendants.

## C. The Snitch Letter

Rochin intends to testify that while celled with Jacobo, he saw a letter Jacobo received from Martinez that said "Rochin is getting ready to snitch; watch him." After getting the letter, Jacobo sent it back to Martinez, who destroyed it.

 Defendants object to this testimony on the grounds that the contents of the letter are inadmissible hearsay because Martinez is unavailable. However, the contents of the letter are not being offered for the truth of the matter asserted. Rochin indeed did snitch and everyone, including the jury, knows this. Instead, the letter is being offered to show a connection between Martinez, Jacobo, and Rochin, thus, Jacobo's association with the Mexican Mafia. As it is not being offered for the truth of the matter asserted, it is not hearsay, and therefore Rochin's testimony about the contents of the snitch letter is admissible against all defendants.

## III.

## CONCLUSION

For the foregoing reasons, the Court rules as follows regarding objections raised to the planned testimony of Jesus Rochin on behalf of the government:

(1) Rochin may testify about the snitch letter, from his personal knowledge, and this testimony is admissible against all defendants;

(2) The birthday card is not admissible;

(3) Rochin may not testify about statements made to him by Jacobo in December 1999, including the convenience store/videotape conversation;

(4) Rochin may testify about statements made to him by Jacobo in July 1999 and this testimony is admissible against Jacobo;

(5) But this testimony is not admissible against any other defendant and therefore Rochin must testify in redacted form.

IT IS SO ORDERED.